IN RE INTEREST OF SHELBY L.,
A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,
V. SHAWNA L., APPELLANT, ROBERT Z., APPELLEE AND
CROSS-APPELLANT, AND DONALD L. AND JUDY L.,
INTERVENORS-APPELLEES AND CROSS-APPELLANTS.
699 N.W.2d 392

Filed July 15, 2005.    No. S-04-028.

James Walter Crampton for appellant.

Jon Bruning, Attorney General, B. Gail Steen, Special Assistant Attorney General, and Jeri Grachek for appellee State of Nebraska.

Leta F. Fornoff, of Fornoff & Schutt, P.C., for appellee Robert Z.

Jeffrey A. Wagner, of Schirber & Wagner, L.L.P., for intervenors-appellees.

Pamela Lynn Hopkins, guardian ad litem.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

## I. NATURE OF CASE

The juvenile court terminated the parental rights of Shelby L.'s mother, Shawna L., based on Neb. Rev. Stat. § 43-292(6) and (7) (Reissue 2004). The Nebraska Court of Appeals affirmed. See *In re Interest of Shelby L.*, No. A-04-028, 2004 WL 2935857 (Neb. App. Dec. 21, 2004) (not designated for permanent publication) (*In re Interest of Shelby L. II*). We granted Shawna's petition for further review. We now reverse, because the State has failed to prove by clear and convincing evidence that termination of Shawna's parental rights was in Shelby's best interests.

We also granted the petition for further review of the maternal grandparents, Donald L. and Judy L. However, because of our disposition of Shawna's petition, it is unnecessary to address the Court of Appeals' determination that it lacked jurisdiction to consider Donald and Judy's appeal from the juvenile court's denial of their petition to intervene.

## II. BACKGROUND

Shortly after Shelby's birth, she suffered from several serious health problems which included a congenital heart disease requiring surgery at 10 weeks, respiratory syncytial virus (RSV) and pneumonia at 6 weeks, gastric reflux, and asthma. She was also diagnosed with a tear duct problem and required ear tubes.

In May 1999, when Shelby was 16 months old, Shawna took Shelby to the emergency room with a second- and third-degree burn on her hand. Shortly after this incident, the Nebraska Department of Health and Human Services (DHHS) received a call from a person alleging that Shawna had "medically" and physically abused Shelby. On June 24, DHHS removed Shelby from Shawna's home and placed her in protective custody.

From the start, DHHS suspected abuse related to "Munchausen's Syndrome by Proxy" (MSBP), which is the name given to factitious disorders in children produced by their parents or caregivers. See 2 Gale Encyclopedia of Medicine 1147 (Donna Olendorf et al. eds., 1999). The American Psychiatric Association defines factitious disorder by proxy as "the deliberate production or feigning of physical or psychological signs or symptoms in another person who is under the individual's care," motivated by the perpetrator's need to assume the sick role by proxy. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 781 (4th rev. ed. 2000).

Later, in November 1999, the Dodge County Court, sitting as a juvenile court, determined that Shelby was a child in need of special supervision under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1998). Shelby remained in foster care for almost 2 years, including 1 year with Shawna's sister and her husband. Around June 1, 2001, DHHS returned Shelby to Shawna. One of the conditions of reunification required Shawna to take Shelby to only one doctor, a new pediatrician, Madeleine MacDonald.

In March 2002, however, DHHS removed Shelby again and placed her back with Shawna's sister because Stephanie Clark, Shelby's caseworker, believed Shawna continued to seek unnecessary medical care. In May, the permanency objective was changed from reunification with Shawna to a guardianship with a concurrent goal of adoption. In July, the juvenile court adopted the case plan. DHHS, however, still allowed Shawna visitation because it believed it was in Shelby's best interests to continue her relationship with Shawna.

Shawna appealed the juvenile court's order changing the permanency objective from reunification to guardianship and adoption. The Court of Appeals affirmed, based upon Clark's opinion that Shawna inaccurately reported Shelby's symptoms to medical providers and failed to provide a safe environment for Shelby. See *In re Interest of Shelby L.*, No. A-02-900, 2003 WL 1962921 (Neb. App. Apr. 29, 2003) (not designated for permanent publication) (*In re Interest of Shelby L. I*).

On June 24, 2003, 1 month after the Court of Appeals affirmed, the State moved to terminate the parental rights of Shawna and Robert Z., the biological father. The amended petition alleged grounds for termination under both § 43-292(7) (15 of most recent 22 months in out-of-home placement) and (6) (reasonable efforts to preserve and reunify family have failed to correct conditions leading to adjudication). Before the termination petition was filed, DHHS removed Shelby from Shawna's sister's home because of her sister's marital and family problems. At that time, Clark determined that it was in Shelby's best interests to terminate Robert and Shawna's parental rights and placed Shelby in a "fos-adopt" home.

After the State filed termination proceedings, the juvenile court granted Donald and Judy's petition to intervene. On October 2, the first day of trial, however, the juvenile court entered an order declining to adjudicate their request until after Shawna's rights were determined.

At the termination hearing, Clark testified that DHHS considered only Shawna's sister for a guardianship. If the guardianship failed, Shelby would be placed for adoption because DHHS believed it had exhausted the services it could provide to Shawna. She testified that during the 2 years Shelby lived in foster care,

Shelby was treated by doctors for illnesses approximately eight times and did not require ongoing medications. In contrast, she testified that during Shelby's 9 months with Shawna, Shelby had 25 doctor visits and 4 emergency room visits. She also stated Shelby had been to a doctor only four times in the 6 months that she had been placed in the "fos-adopt" home. Clark further testified that one of the conditions of placement with Shawna required that Shawna contact her each time Shelby was to see a doctor. She stated, however, that Shawna had contacted her before seeking medical treatment only three-fourths of the time. She did, however, testify that Shawna contacted DHHS after every appointment to report symptoms if she could not reach Clark or the family support worker beforehand. At the termination hearing, Clark conceded that Shawna loved Shelby, that Shelby had a positive relationship and interacted well with Shawna, and that mother and daughter had bonded.

After the trial, the court terminated both parents' rights. The court determined that the State had shown grounds for terminating Shawna's parental rights under both § 43-292(6) and (7). The court also denied Donald and Judy's intervention petition because it concluded that they no longer had standing to intervene.

All three parties, Shawna, Robert, and Donald and Judy, appealed. The Court of Appeals affirmed. See *In re Interest of Shelby L. II*. The court stated that although neither the guardian ad litem nor the State had argued why it was in Shelby's best interests to terminate Shawna's parental rights, it nonetheless found clear and convincing evidence to terminate. The court relied on Clark's testimony that when Shelby was in foster care, she was not ill. See *id.*

The Court of Appeals also concluded that it lacked jurisdiction to consider Donald and Judy's appeal because they failed to appeal from the juvenile court's October 2, 2003, "final order." In that order, the juvenile court declined to consider "their 'motion for placement' until after the issue of termination . . . was determined." *Id.* at *8.

Shawna and Donald and Judy petitioned for further review. Robert and Shawna are divorced, and he has not sought further review.

## III. ASSIGNMENTS OF ERROR

Shawna assigns that the Court of Appeals erred in determining that the State had proved by clear and convincing evidence termination was in Shelby's best interests and that the State had made reasonable efforts toward reunification.

Donald and Judy assign that the Court of Appeals erred in (1) concluding that the October 2, 2003, ruling was a final, appealable order and (2) affirming the juvenile court's December 29 order, determining that the termination of Shawna's parental rights extinguished their request for placement despite their successful intervention.

## IV. STANDARD OF REVIEW

In an appeal from a judgment or order terminating parental rights, an appellate court, in a trial de novo on the record and disregarding impermissible or improper evidence, determines whether there is clear and convincing evidence to justify termination of parental rights under the Nebraska Juvenile Code. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

## V. ANALYSIS

### 1. TERMINATION OF SHAWNA'S PARENTAL RIGHTS

The juvenile court found clear and convincing evidence to terminate Shawna's parental rights under both § 43-292(6) and (7). The State contends that neither parent contested that Shelby was in out-of-home placement for over 15 of the most recent 22 months when the petition was filed and that Shawna was unable to rehabilitate herself in that time. Although the State does not argue in its brief why it is in Shelby's best interests to terminate Shawna's parental rights, at oral argument, the State asserted that Shawna had continued to place Shelby at risk by seeking unnecessary medical treatment.

Shawna, however, contends that the Court of Appeals erred in determining that the State proved by clear and convincing evidence that termination was in Shelby's best interests. She argues that (1) Clark's opinion that she placed Shelby at risk by seeking unnecessary medical treatment was not credible because MacDonald's testimony showed Shawna had not harmed Shelby

through medical contacts or treatment and (2) the State admitted that Shawna and Shelby are bonded.

For a juvenile court to terminate parental rights under § 43-292, it must find that termination is in the child's best interests and that one or more of the statutory grounds listed in this section have been satisfied. The State must prove these facts by clear and convincing evidence. See *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Aaron D., supra.*

Here, the State satisfied the statutory ground for termination under subsection (7). See § 43-292(7) (allowing termination if juvenile has been in out-of-home placement for 15 or more of most recent 22 months). The State removed Shelby the second time on March 12, 2002, and she had been in continuous out-of-home placement for 15 months and 12 days when the termination petition was filed on June 24, 2003. If this were the only ground for termination, the only question would be whether termination was in Shelby's best interests. See *In re Interest of Aaron D., supra.* But the juvenile court also found grounds for termination under subsection (6). In *In re Interest of Aaron D.*, we stated that the evidence adduced to prove termination on any statutory ground other than subsection (7) is "highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse." 269 Neb. at 260, 691 N.W.2d at 173. Thus, whether the State proved by clear and convincing evidence grounds for termination under subsection (6) is highly relevant to a determination of Shelby's best interests.

When a court adjudicates a juvenile under § 43-247(3)(a), a termination under § 43-292(6) requires a finding that reasonable efforts to preserve and unify the family under the direction of the court have failed to correct the conditions leading to the determination. *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the children require termination of the parental rights. *In re Interest of Mainor T. & Estela T., supra.*

At the termination hearing, Clark again contended that Shawna's inaccurate reporting of Shelby's symptoms put Shelby at risk because it was harmful to place a child on unnecessary medications. Implicit in her testimony is the assumption that Shawna had subjected Shelby to unnecessary medical treatment. Thus, we look to the only relevant allegation from the adjudication: Shawna "has subjected Shelby to excessive and unnecessary medical treatment to the detriment of the child."

### 2. JUVENILE COURT'S FINDINGS REGARDING TERMINATION OF SHAWNA'S PARENTAL RIGHTS

The juvenile court found clear and convincing evidence that Shawna had failed to comply with her goals and objectives and had placed Shelby at risk. The court specifically found that Shawna's "indifference to a time when Shelby appeared to be ill as she was playing cards with a friend and waited till the next day to then take her to an emergency room is indication [sic] to the court that she is still unable to care for Shelby's needs." The court apparently made this finding based on Shawna's testimony regarding her medical contacts over a 3-day period in July 2001 when Shelby had an earache.

Yet, the record shows that during this 3-day period, Shawna took Shelby to MacDonald's office on Friday, July 13, 2001, for an earache that had started on Thursday. The rest of Friday and Saturday, Shelby was not feeling well. Saturday evening, Shawna had a friend over to play cards and held Shelby the entire time because Shelby would not sleep otherwise. The record reveals that around midnight, Shawna called a nursing service provided by MacDonald's office and then took Shelby to the emergency room, as she had been instructed. On Sunday morning, the emergency room physician called to advise Shawna to watch Shelby to make sure she was urinating. Later that day, after consulting the family support worker, Shawna called the nursing service again about Shelby's temperature and infrequent urination. The nursing service advised her to take Shelby to Children's Hospital in Omaha. The hospital physicians saw no sign of dehydration, but they did diagnose Shelby with tonsillitis and viral syndrome.

The juvenile court's finding that Shawna failed to immediately seek emergency medical treatment obviously does not support

termination based on the relevant allegation from the adjudication petition, i.e., that Shawna had subjected Shelby to unnecessary medical treatment to her detriment. The court not only ignored the relevant allegation, its finding demonstrates Shawna's dilemma. On the one hand, the juvenile court viewed Shawna's attempts to comfort Shelby before seeking emergency medical care as an indication that she did not recognize when Shelby required emergency medical care. On the other hand, Clark testified that there was no reason for Shawna to seek emergency medical care over this 3-day period and even emphasized the emergency room visits to bolster her opinion that Shawna was seeking unnecessary medical care.

### 3. COURT OF APPEALS' DETERMINATION

The Court of Appeals affirmed the termination order based on Clark's testimony. It noted that Clark testified Shawna failed to demonstrate she would seek only necessary medical care for Shelby, failed to follow the safety plan, failed to report Shelby's doctor appointments 25 percent of the time, and reported symptoms to Clark that were inconsistent with what she had reported to the medical care provider. The court quoted Clark as stating: " 'When Shelby's been with Shawna, [Shelby] appears to be quite ill. When Shelby is not with Shawna, [Shelby] is very healthy, and I think that is the concern.' " *In re Interest of Shelby L. II*, 2004 WL 2935857 at *4.

### (a) Seeking Unnecessary Medical Treatment

We recognize that at the adjudication hearing, Shawna admitted to seeking unnecessary medical care to Shawna's detriment. At the termination hearing, however, Clark testified to specific facts about Shelby's health and medical contacts in her first 17 months. The State introduced these facts as circumstantial evidence that Shelby was at risk whenever Shawna was responsible for her medical decisions. As the Court of Appeals' opinion demonstrates, the State's proof that Shelby was at risk with Shawna depended heavily upon contrasting Shelby's health and medical contacts while in Shawna's care to her health and medical contacts while in foster care. Keeping in mind the State's standard of clear and convincing burden of proof, we review the sufficiency of this circumstantial evidence.

The State's conclusion that Shawna placed Shelby at risk hangs on two premises: (1) Shelby was seen by a doctor less frequently in foster care and (2) Shelby's health substantially improved in foster care. But the State's argument and conclusion collapse under the weight of the evidence. First, the State failed to prove its premise that Shelby was substantially healthier in foster care. More important, the State's premises do not necessarily support its conclusion.

### (i) Shawna's Medical Contacts

Clark testified that before Shelby's first removal in June 1999, Shawna had made 195 medical contacts with 11 different doctors, whereas in foster care, Shelby was seen by a doctor for illnesses approximately 8 times. But the significance of Shawna's medical contacts during Shelby's first 17 months of life cannot be reviewed in a vacuum. This record shows both that Shelby had significant health problems from birth and that many of DHHS' reported "contacts" are of no consequence.

Clark's conclusion relied on a summary of Shawna's calls to and appointments with medical providers during Shelby's first 17 months; the summary was compiled by Clark's predecessor through a Medicaid tracking service. The summary includes an examination at birth, "well-baby" checkups, followup appointments, and telephone calls to make appointments or to get dosages for over-the-counter medicines. The record also shows that most of the doctors Shawna contacted were emergency room physicians or physicians to whom Shelby was referred by her primary physician.

In the context of Shelby's medical history, these contacts fail to establish that Shawna placed Shelby at risk by seeking unnecessary medical care. As noted, the record shows that Shelby endured serious medical problems before her first removal. The State adduced no evidence to show that Shawna was responsible for these conditions.

### (ii) Shelby's Health Improvements During Foster Care

Clark also testified that after Shelby's first removal from Shawna, she gained weight during her first 11 months in foster care, she did not require ongoing medications, and the symptoms Shawna had reported were no longer observed. This indicated to

Clark that the medical treatment Shelby had received was unnecessary. DHHS had earlier concluded Shelby's low weight gain and gastric reflux before her first removal were consistent with MSBP because she gained weight in foster care and her symptoms of gastric reflux reportedly diminished considerably after her removal.

Although, before Shelby's first removal, Shawna frequently reported gastric reflux symptoms, Shelby's gastric reflux was evident during a 3-day hospitalized observation. Thus, the State has failed to prove that Shelby's gastric reflux condition did not exist. Regarding Shelby's weight, in May 1999, Shelby's first primary physician noted in response to Shawna's concerns that Shelby's "recent illnesses could account for her poor weight gain but I also think she is just small." Shortly after Shelby's 3-day hospitalization, the record shows Shelby began to gain some weight before her removal in June.

Although Shelby's weight and gastric reflux symptoms did improve in foster care, MacDonald testified that children often outgrow protein intolerance and gastric reflux by the time they are 2 years old. She concluded that Shelby's lack of gastric reflux symptoms after her first removal could indicate inaccurate reporting, or it could indicate that Shelby was outgrowing the problem. MacDonald also addressed Clark's testimony that Shelby required no ongoing medications and was not taken to a doctor as often in foster care. MacDonald testified that this pattern could be attributed to the fact that children's immunities improve and their air passages get larger as they get older.

Moreover, the State did not prove that Shelby was not ill in foster care. This record shows that while in foster care, Shelby was treated for many of the same medical problems Shawna had reported before Shelby's first removal. These included viral respiratory infections, reactive airway disease, asthma, bronchitis, RSV, pneumonia, croup, allergies, and conjunctivitis. Because MacDonald testified that many of Shelby's symptoms could have abated simply by her getting older, and because many of Shelby's same medical problems continued in foster care, the State failed to establish that Shelby's health substantially improved in foster care beyond what would have occurred naturally. Thus, neither MacDonald's testimony nor the State's evidence

supports a conclusion that Shelby's conditions before her first removal were such that they would not have existed except for the acts or omissions of Shawna.

### (iii) Shelby's Medical Contacts During Reunification

Shawna admitted that she had taken Shelby to the doctor more during the reunification period than had the foster care providers. But MacDonald's testimony directly contradicted Clark's testimony that Shawna had sought unnecessary emergency medical treatment and had placed Shelby at risk through her medical contacts while she was reunited with Shelby. MacDonald testified that she had reviewed the hospital reports regarding Shelby's two emergency room visits in July 2001 and was unconcerned with either of the treatments. She said that Shawna had not acted inappropriately by following the directions of the nursing service.

MacDonald believed that Shawna needed extra reassurance and education because "there may be some extent of a vulnerable child syndrome," which she described as a spectrum of parents with a heightened awareness of their child's health due to the child's real medical problems. But MacDonald testified that if she had suspected MSBP or believed that there was an issue with vulnerable child syndrome to the point of causing harm to Shelby, she would have made a referral for a diagnosis. She specifically testified, however, that she had never diagnosed either disorder and that she did not believe it was necessary to make a referral.

Finally, Clark admitted that during reunification, many of Shawna's medical contacts for Shelby were necessary and that no doctor had ever reported to her that an office visit or emergency room treatment was unnecessary. In fact, Clark could not point to any of Shelby's medical appointments that were unnecessary or point to any harm Shelby had suffered because of a medical contact during reunification.

In sum, the State produced no evidence that Shawna intentionally induced or falsified Shelby's symptoms or was even suspected of this behavior. Furthermore, the State failed to adduce expert testimony that Shawna was diagnosed with MSBP disorder. In the absence of proving medical abuse, the State has shown that Shawna is overprotective, excessively worries, and sometimes takes Shelby to the doctor for minor problems. But

MacDonald did not believe Shelby had been harmed by any of Shawna's medical contacts, and Clark could not point to any harm because of these contacts.

### (b) Failure to Contact Clark

Clark also contended that Shawna failed to follow the rehabilitation plan during reunification by not calling Clark before every doctor appointment. The juvenile court additionally found that Shawna had continued to take Shelby to other doctors without seeking Clark's permission. The case plan and court order for reunification are not part of this record. Clark testified that during reunification, Shawna was required to take Shelby to a new pediatrician, MacDonald, and no other doctor, and to contact Clark before and after appointments. Shawna was to allow only her sister to provide daycare.

Nothing in the record suggests that during reunification, Shawna took Shelby to any other clinic besides MacDonald's office. Clark testified that Shawna sought emergency room treatment on four occasions. But the record shows that Shawna paged the family support worker on three of these occasions and that Shawna had been advised to take Shelby to the hospital by MacDonald's nursing service on the one occasion that she did not page the family support worker first.

Although Shawna did not call Clark or the family support worker before every office visit with MacDonald, Clark did testify that Shawna had always called to report Shelby's symptoms after every visit, if not before. Clark testified that the purpose for this requirement was not to obtain Clark's permission to seek medical care, but to allow Clark to compare the symptoms Shawna reported to her to those Shawna reported to a doctor. So, Shawna substantially complied with the reporting requirement by usually contacting Clark or the family support worker before appointments and calling afterward if she could not reach either of them beforehand.

### (c) Shawna's Inaccurate Reporting of Symptoms

Finally, our review of the record indicates that Shawna's alleged inconsistent reporting of symptoms did not rise to the level of intentionally falsifying symptoms and that the inconsistencies are often overstated or misstated. For example, Clark and

the family support worker testified that in separate instances, Shawna had reported a higher temperature to DHHS than was recorded by a medical provider. Yet, in one of those instances, the doctor noted Shawna reported Shelby had a higher temperature *the day before* Shelby was seen. In our de novo review, we conclude that Shawna's alleged inconsistencies simply do not reflect the type of inaccurate reporting that supports the termination of a parent's rights.

We determine that the State has failed to prove by clear and convincing evidence grounds for termination of Shawna's parental rights under subsection (6). Nor has the State proved that it is otherwise in Shelby's best interests to terminate Shawna's parental rights. The record shows that during the time Shelby was in foster care, Shawna, on her own initiative, paid to take three parenting courses to improve her parenting skills. Clark admitted that Shawna had followed through with the therapy required by DHHS and had been released from treatment. Both Clark's testimony and the record support Shawna's contention that during reunification, she was more likely to try to comfort Shelby before seeking medical treatment and greatly reduced the times she took Shelby to the doctor. Further, the evidence is uncontroverted that Shelby and Shawna are bonded and have positive interactions, and DHHS has stated on two occasions that it was in Shelby's best interests to maintain her relationship with Shawna because of their positive relationship and their family network.

We conclude that the State has failed to prove by clear and convincing evidence that the termination of Shawna's parental rights was in Shelby's best interests.

### 4. Donald and Judy's Standing to Appeal

In their petition for further review, Donald and Judy assign the Court of Appeals erred in concluding that the October 2, 2003, order was a final, appealable order from which they failed to appeal. Thus, the court affirmed the juvenile court's December 29 order that terminated Shawna's parental rights and extinguished their request for placement despite their successful intervention. Because we determine that the State failed to prove by clear and convincing evidence that it is in Shelby's best interests to terminate Shawna's parental rights, it is unnecessary to address the

Court of Appeals' determination that it lacked jurisdiction to consider Donald and Judy's appeal.

## VI. CONCLUSION

The Court of Appeals erred in affirming the juvenile court's termination order. Although Shelby was in out-of-home placement for 15 months and 12 days of the most recent 22 months, we conclude that the State failed to prove by clear and convincing evidence that termination of Shawna's parental rights is in Shelby's best interests.

REVERSED.