IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF JAMESON S. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF JAMESON S. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ROBERT S., APPELLANT.


Filed October 11, 2016.   No. A-16-243.


Appeal from the Separate Juvenile Court for Douglas County: DOUGLAS F. JOHNSON, Judge. Affirmed.

Michael Greenlee, of Law Office of Michael Greenlee, for appellant.

Donald W. Kleine, Douglas County Attorney, and Jennifer C. Clark for appellee.


MOORE, Chief Judge, and PIRTLE and RIEDMANN, Judges.

PIRTLE, Judge.

INTRODUCTION

Robert S. appeals from an order of the separate juvenile court for Douglas County which terminated his parental rights to his four minor children. Robert challenges the juvenile court's finding that his parental rights should be terminated pursuant to Neb. Rev. Stat. § 43-292(2) and (6) (Cum. Supp. 2014) and the court's finding that termination of his parental rights is in the children's best interests. Upon our de novo review of the record, we find that the State presented sufficient evidence to warrant termination of Robert's rights. As such, we affirm the order of the juvenile court terminating Robert's parental rights to his four children.


- 1 -

BACKGROUND

Robert is the biological father to Jameson S., born in August 2012; Jozlyn S., born in September 2011; Jerzi S., born in September 2010; and Iniyah S., born in January 2008.

On April 12, 2013, the State filed a supplemental petition alleging that the children were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) by reason of the faults or habits of Robert in that on March 29, 2013, the residence of the children was found by law enforcement to be in a filthy and unwholesome condition; Robert had failed to provide the children with proper parental care, support, and/or supervision; Robert had failed to provide safe, stable and/or appropriate housing for the children; and due to the above allegations, the children were at risk for harm.

On June 13, 2013, the court entered an adjudication and disposition order finding that the children came within the meaning of § 43-247(3)(a) by a preponderance of the evidence. Robert had pled no contest to the allegations in the supplemental petition which alleged that, the residence of the children was found by law enforcement to be in a filthy and unwholesome condition, that Robert had failed to provide the children with proper parental care, support, and/or supervision and that this placed the children at risk for harm. The remaining allegation, that Robert had failed to provide safe, stable and/or appropriate housing for the children, was dismissed. The court ordered that the children would remain in the temporary custody of the Nebraska Department of Health and Human Services with placement to include the home of Robert and Tiffany F., the children's biological mother. Robert was ordered to cooperate with Intensive Family Preservation (IFP) services in the home for up to 18 weeks; abstain from alcohol and/or controlled substances; undergo random drug testing; obtain and maintain a legal source of income; and obtain and maintain adequate and safe housing.

On October 17, 2014, the State filed an ex parte motion for immediate custody of the children. The attached affidavit for removal alleged that the children had tested positive for methamphetamine and marijuana. The children's maternal grandmother, who lived in the family home, admitted to using methamphetamine and marijuana in the home. Robert also tested positive for ingestion of methamphetamine and marijuana. The juvenile court entered an order for immediate custody the same day and the children were removed from the home.

On August 5, 2015, the court entered a review and permanency planning order, finding that the case had been open since April 2013 and the children are no closer to reunification with Robert. It ordered that no further reasonable efforts were required for reunification with Robert. On October 27, 2015, the court entered an order to suspend visitation between Robert and the children until further order of the court. In November 2015, the court entered another order stating that visitation would remain suspended until Robert complied with certain requirements.

On October 27, 2015, the same day the court suspended visits, the State filed a second motion for termination of Robert's parental rights to all four children. In the motion, the State alleged that termination was warranted pursuant to Neb. Rev. Stat. § 43-292(2), because Robert had substantially and continuously or repeatedly neglected and refused to give his children necessary parental care and protection, and § 43-292(6), because reasonable efforts to preserve and reunify the family failed to correct the conditions that led to the determination that the children

were within the meaning of § 43-247(3)(a). In addition, the State alleged that termination of Robert's parental rights was in the children's best interests.

On January 29, 2016, a hearing was held on the State's second motion for termination of Robert's parental rights. The State had also filed a motion for termination of Tiffany's parental rights to Jameson, Jozlyn, Jerzi, and Iniyah, in addition to Tiffany's two other children, Devon F. and Allanah W. A joint trial was held on the termination motions. However, Tiffany is not a party to this appeal and this appeal does not involve Devon and Allanah.

The State called various witnesses in its effort to prove that Robert's parental rights should be terminated. Wylesha Franklin, an Intensive Family Preservation (IFP) specialist, testified that her job involves trying to reunify children with their parents through skill building and working toward goals set by Nebraska Family Collaborative (NFC). Franklin was assigned to Robert's family in May 2014, and worked with the family until December 2014, when she left on maternity leave and referred the case over to another worker in her absence. In April 2015, she returned to work and got the case back but only for a brief time because NFC closed out the case in May or June 2015 for lack of progress.

Franklin testified that the initial goals that had been set for Robert included attending parenting classes, learning how to discipline his children appropriately, gaining and maintaining employment, and tending to the tidiness of the home. When Franklin returned to the case in April 2015, the goals for Robert remained the same, with the additional requirements that he attend Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) and start therapy.

Franklin testified that she visited the family about three times per week and she did not see much progress made by Robert, and that any positive steps that were made were not consistent. Franklin attempted to teach Robert different ways to motivate the children to behave, and how to appropriately discipline them, but he would not follow through with disciplining the children. On the occasions that he would try to discipline the children, he was not successful. Franklin also testified that Robert started parenting classes, but did not complete them.

Franklin testified that Robert did not complete the goals that were set for him, nor did he follow through with what Franklin told him he needed to do to help reach those goals. Specifically, Franklin testified that when she left the case in May or June 2015, none of the goals that centered on employment and parenting were completed. Franklin testified that Robert was employed for portions of time when she was assigned to the case, but not the entire duration of the case. Franklin also stated that Robert did not have an identification (ID) card which made it difficult to obtain employment. Franklin asked NFC for funds to give Robert so he could obtain an ID card, but NFC told Franklin they had already done so. Franklin also testified that she tried to help Robert and Tiffany file taxes so they could use any tax refund to obtain their own housing, but they could not file because Robert did not have an ID card.

Katlynn Osborn, Iniyah's therapist, testified that from June to October 2015, she supervised therapeutic visits between the children, Robert and Tiffany. Visits took place twice per week but Osborn supervised only one of the visits each week. Osborn testified that she observed problems during the therapeutic visits, such as lack of intervention and discipline by the parents, physical and verbal aggression by the children, and possible re-traumatizing of Iniyah and regression from her therapeutic progress.

Osborn stated that that during therapeutic visits the children would scream, yell, get upset, kick, throw things, and hit things, and Robert would comfort the children but would not intervene with discipline or timeout strategies and Osborn would have to intervene. Osborn testified she attempted to teach Robert how to implement appropriate strategies for redirecting the children, but Robert would respond that he knew how to parent. Robert also told Osborn that because he only got two hours with the children during visits, he did not want to spend that time punishing or disciplining the children. Osborn also testified that she suggested family therapy to Robert, but he told her that his family did not need family therapy.

After therapeutic visits began, Iniyah displayed symptoms of retraumatization in that she was defiant, acting out, crying, and showing signs of withdrawal. Osborn felt that therapeutic visits were hindering Iniyah's progress because her emotions and anxiety had escalated and she was unable to identify her emotions and thoughts as effectively as when she was in individual therapy. Therapeutic visits were discontinued in October 2015, and Osborn testified that Iniyah has been making progress since then.

Osborne testified that she recommended suspending therapeutic visits because she thought it was in the children's best interests due to Robert's lack of progress. She further testified that nothing has happened since that recommendation that would change her mind such that she would allow visits to resume. Osborn testified that during a family team meeting, the parties had agreed that before visits could resume, Robert had to do an initial diagnostic interview, a chemical dependency evaluation, submit to drug testing, start individual therapy, and demonstrate measurable progress. To Osborn's knowledge, Robert completed an initial diagnostic interview and a chemical dependency evaluation, but failed to start individual therapy. Further, Osborn testified that Robert was still testing positive for marijuana.

David Yoble testified that he was the other therapist who conducted therapeutic visits for the family between June and October 2015. He testified that he urged Robert to discipline the children appropriately, and told him it was necessary. He testified that when he tried to redirect Robert during the visits, he did not comply. Yoble stated that Robert did not want to punish the children during a visit because of the limited amount of time he had with them.

Allison McElderry, a family permanency specialist for NFC, testified that she was assigned to Robert's case from July 2014 to October 2015. At the time she was assigned the case, the minor children were still placed in the parental home. The services included random drug testing through UAs, IFP services, transportation, and financial resources, which included getting the children on Medicaid and helping Robert find a job and housing. McElderry testified that Robert was not employed when she was assigned to the case, and that he had been sporadically employed throughout the case, having had several different jobs. She testified that the longest period of time Robert was employed was no longer than two months during the time she was the case manager.

McElderry testified that after the children were removed from the home in October 2014, the court ordered that Robert was to continue working with IFP services, continue to undergo random drug testing, obtain employment, obtain housing, and have supervised visits with the children.

McElderry testified that Robert was also ordered to undergo an initial diagnostic interview and a chemical dependency evaluation. In order to assist him in completing those evaluations,

McElderry explained the importance of completing those evaluations, and told him who to contact to set them up. McElderry also received funds from NFC to pay for Robert's initial diagnostic interview, McElderry and Franklin offered to transport Robert to a testing agency, McElderry offered to meet Robert at the agency if he scheduled a time, and McElderry provided Robert bus tickets several times so he could get to an agency, but he failed to follow through and complete the evaluations. Robert did at one point schedule his evaluations for August 2015, but he did not make it to the appointment. That same month, the juvenile court ordered that reasonable efforts were no longer required and that NFC would no longer be required to pay for services.

McElderry stated that in January 2015 she found out that Robert did not have an ID card, which he needed to obtain employment. Robert and Tiffany were also unable to file a tax return because Robert did not have an ID card. McElderry offered to pay for Robert's ID, and gave Robert bus passes to complete the task. McElderry also called a company that provides free ID cards and scheduled an appointment for Robert, but Robert did not show up. McElderry testified that she did not know if Robert ever obtained an ID card.

McElderry further testified that during the time she worked with Robert, there had been three different agencies doing Robert's UA testing because he had been discharged at various times for failing to participate in UA's. McElderry also testified that Robert was required to participate in AA and NA meetings and obtain a sponsor. Robert had not provided McElderry with any documentation proving his attendance or the name of a sponsor throughout the entire time she was assigned to the case. McElderry stated there were times that Robert told her he had lost his card, or admitted that he had not gone to meetings. McElderry testified that she provided Robert with a booklet that listed the locations, dates, and times for AA and NA meetings, and bus passes so he could get to meetings. One of the meeting locations was within walking distance of Robert's home.

In regard to housing, McElderry testified that during the time she was assigned to the case, Robert, Tiffany, and the children resided in Tiffany's mother's home. McElderry testified that the housing situation was a barrier to reunification because she did not believe the home was safe for the children based on the grandmother's admission that she has a methamphetamine addiction. McElderry was also concerned because the home was usually unkempt and unclean. She observed moldy dishes in the home, as well as multiple piles of laundry and trash that barricaded several areas of the home. In addition, the size of the home concerned McElderry. It was a two-bedroom townhouse and there were three adults, Robert and Tiffany's four children and two other children of Tiffany's living in the home. The children had to sleep on either the floor, a chair, or a pull-out couch in the living room.

McElderry informed Robert that NFC would provide money for a down payment on a house, should he find one the family could afford long-term. She testified that Robert's inability to obtain and maintain a consistent income precluded him from being able to provide and maintain his own housing. At no point during the entirety of the case did Robert obtain long-term employment.

Additionally, McElderry testified that IFP services were provided to the family during the case until May 2015, when Robert was discharged from such services due to noncompliance. Robert frequently did not show up for appointments and did not make any progress towards meeting the goals that had been set.

McElderry also testified that visitation was changed from supervised to therapeutic in June 2015 because she and the therapists felt that progress was not being made during supervised visitation due to their "chaotic nature." McElderry stated there was a lack of discipline during the visits, a lack of cooperation and appropriateness between the parents, and a lack of engagement of the parents towards the children. Prior to the switch from supervised to therapeutic visitation, Robert was inconsistent with his attendance, and after visits transitioned to therapeutic, McElderry testified that his attendance was consistent "for the most part."

McElderry stated that during the time she had been working with the family, Robert had not made progress. She testified that he was not consistent in complying with court orders, in making behavioral changes, or in making changes in his relationship with Tiffany, which McElderry described as volatile and unhealthy. Robert also failed to obtain housing and continued to use drugs. McElderry described Robert's attempts to find housing as "minimal".

McElderry opined that Robert's parental rights should be terminated. She believed it was in the minor children's best interests to terminate Robert's parental rights based on the length of time the children had been out of the home and because Robert had not made sufficient progress to be able to care for the children appropriately.

Kara Lineweber, a family permanency specialist with NFC, took over the case from McElderry in October 2015. At that time, the court had ordered that reasonable efforts for reunification were no longer required for Robert. The second motion for termination was also filed in October 2015. Lineweber testified however, that following a hearing in November 2015 regarding visitation, the court entered an order stating that visitation would remain suspended until Robert complied with certain requirements. The requirements included that Robert participate in individual therapy, undergo a chemical dependency evaluation, and participate in random UA testing. Lineweber testified that Robert complied with UA testing through December 2015, but all of tests results since the court's November 2015 order were positive for marijuana. Lineweber further testified that Robert had missed the last five tests that were requested the two weeks before trial.

Robert completed the chemical dependency evaluation in January 2016. Lineweber stated that the evaluation results recommended individual therapy and intensive outpatient therapy for substance abuse. Lineweber testified that Robert had not started individual therapy sessions or substance abuse treatment, nor had he asked for assistance in getting individual therapy or substance abuse treatment started. She also testified that the family was still living in the grandmother's home and Robert had not shown her any proof of a legal source of income. In regard to maintaining sobriety and following through with therapeutic services recommendations, Lineweber testified that the parents have made no progress.

Following the termination hearing, the juvenile court entered an order finding that the State had proved by clear and convincing evidence that grounds for termination of Robert's parental rights existed under § 43-292(2) and (6) and that termination of his parental rights was in the children's best interests. The court ordered that Robert's parental rights to Jameson, Jozlyn, Jerzi, and Iniyah be terminated.

## ASSIGNMENTS OF ERROR

On appeal, Robert assigns that the juvenile court erred (1) in finding there was clear and convincing evidence to establish that grounds for termination existed under § 43-292(2) and (6) and (2) in finding there was clear and convincing evidence to establish that termination of Robert's parental rights was in the children's best interests.

## STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Miah T.*, 23 Neb. App. 592, 875 N.W.2d 1 (2016).

## ANALYSIS

*Statutory Grounds.*

In order to terminate an individual's parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of the fact to be proved. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

Robert first assigns that the juvenile court erred in finding there was clear and convincing evidence to establish that grounds for termination existed under § 43-292(2) and (6). Upon our de novo review of the record, we find that the State presented clear and convincing evidence to prove that termination was warranted pursuant to § 43-292(6). As such, we need not specifically address the juvenile court's determination as to § 43-292(2).

Section 43-292(6) provides that a court may terminate parental rights when, "[f]ollowing a determination that the juvenile is one as described in [§ 43-247(3)(a)], reasonable efforts to preserve and reunify the family . . . have failed to correct the conditions leading to the determination."

On June 13, 2013, the juvenile court adjudicated all four children to be within the meaning of § 43-247(3)(a), after Robert admitted that the home of the children was in a filthy and unwholesome condition, that he had failed to provide the children with proper parental care, support, and/or supervision, and that the children were at risk for harm. Pursuant to Robert's admissions, the court ordered him to cooperate with Intensive Family Preservation (IFP) Services in the home for up to 18 weeks; abstain from alcohol and/or controlled substances; undergo random drug testing; obtain and maintain a legal source of income; and obtain and maintain adequate and safe housing.

Over a year later, when the children were removed from the home, the rehabilitation plan largely remained the same. Robert was ordered to continue working with IFP services, continue to undergo random drug testing, obtain employment, obtain housing, and have supervised visits with

the children. He was also ordered to undergo an initial diagnostic interview and a chemical dependency evaluation.

From the time of the adjudication until the termination hearing, the State has provided Robert with services and resources to help him achieve the court ordered goals necessary for reunification. Despite the reasonable and numerous efforts provided by the State, Robert has failed to meet the court's requirements and failed to correct the conditions that led to the adjudication.

Franklin, an IFP specialist, testified that during the time the case was assigned to her, Robert did not complete the goals that had been set for him, specifically the goals centered on employment and parenting. Robert started parenting classes with Franklin but did not complete them.

Osborn and Yoble, who supervised therapeutic visits between Robert and the children, testified that there was a lack of intervention and discipline at visits. Osborn tried to teach Robert how to implement appropriate strategies for redirecting the children, but Robert would state that he knew how to parent. Similarly, Yoble testified that Robert was noncompliant with his strategies for redirecting the children. Robert would try to comfort the children when they were acting out, but would not intervene with discipline. Robert also told Osborn and Yoble that because he only got to spend a limited amount of time with the children, he did not want to discipline or punish them. Osborn recommended that therapeutic visits be suspended due to Robert's lack of progress. Osborn also testified that Robert declined family therapy because his family did not need it.

McElderry testified that she tried to assist Robert in setting up an initial diagnostic interview and a chemical dependency evaluation, which were ordered after the children were removed from the home in October 2014, with no success. She told him who to contact, obtained cash from NFC to pay for the interview, offered to transport him to a testing agency or meet him there, and provided bus tickets. However, Robert did not complete an initial diagnostic interview or a chemical dependency evaluation during the time she was assigned to the case. There was evidence that Robert did complete an initial diagnostic interview in September 2015 and a chemical dependency evaluation in January 2016, but at the time of the termination hearing he had not followed through with the recommendations.

IFP services were provided to Robert from the beginning of the case. However, in May 2015, Robert was discharged from IFP services due to his noncompliance and failure to make any progress.

Throughout the duration of this case, Robert has been ordered to obtain and maintain employment and he has failed to meet that goal. He worked at various times for short time periods, but nothing longer than a couple months. The main obstacle to obtaining employment was his failure to obtain an ID card. McElderry offered to have NFC pay for Robert's ID card and gave him bus passes to get the card. She also scheduled an appointment for him at a place that provides free ID cards, but he missed the appointment.

The failure to obtain and maintain employment, precluded Robert from obtaining his own housing, another goal that has been consistent throughout the case. Robert, Tiffany, and the children have been living with the children's grandmother in her home, which McElderry testified was a barrier to reunification because she did not believe the home was safe for the children. At the time of trial, the housing situation had not changed.

McElderry told Robert that NFC would pay for a down payment on a house, should he find one he could afford long-term, but without a consistent income this did not happen. McElderry and Franklin offered to help file a tax return so he could use the tax return money for a down payment on housing. However, a tax return could not be filed without an ID card. McElderry described Robert's attempts to find housing at "minimal."

Further, Robert is still testing positive for marijuana, despite the long-standing order that he abstain from alcohol and/or controlled substances. After initially being placed in the parental home following adjudication, the children were removed in October 2014 because they tested positive for methamphetamine and marijuana exposure, and Robert testified positive for the ingestion of methamphetamine and marijuana.

Throughout the case, Robert was ordered to undergo random UA tests and he has been discharged more than once by the testing agencies for failing to participate. After the order for random UA testing was reinstated in November 2015, Robert had complied with UA test requests through December 2015, but all tests results were positive for marijuana. Further, Robert had missed the last five test requests in the two weeks prior to the termination hearing. Robert had also been ordered to participate in AA and NA meetings and obtain a sponsor. McElderry testified that Robert never provided her with any documentation proving attendance or the name of a sponsor.

McElderry testified that during the time she worked with the family, Robert had not made any progress toward reunification. Lineweber testified that in regard to maintaining sobriety and following through with therapeutic services recommendations, Robert has made no progress.

The evidence presented at the termination hearing showed that the State has made reasonable efforts to reunify Robert with the children. However, in the two and a half years between the children's adjudication and the termination hearing, he has failed to consistently or completely comply the court's rehabilitation orders, and has failed to make any significant progress toward reunification. As a result, he has failed to correct the reasons the children were adjudicated and has not placed himself in a position to parent his children. As previously stated, we find that the State presented clear and convincing evidence to prove that termination was warranted pursuant to § 43-292(6). Robert's first assignment of error is without merit.

*Children's Best Interests.*

Robert also assigns that the juvenile court erred in finding that termination of his parental rights is in the children's best interests. There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* Parental unfitness in the context of termination of parental rights cases is a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Jeremiah J. v. Dakota D.*, 287 Neb. 617, 843 N.W.2d 820 (2014).

In a juvenile proceeding to terminate parental rights, the evidence adduced to prove termination on any statutory ground other than Neb. Rev. Stat. § 43-292(7) is highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re*

*Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005). As we discussed above, Robert has failed to make significant progress toward reunification with his children despite the efforts of the Department and the juvenile court. Robert was given reasonable time, more than two and a half years, to comply with the rehabilitation plan. Yet at the time of the termination hearing, there was no evidence that he had ever obtained an ID card, he had not obtained employment, he had not obtained independent housing, and he was still using drugs. Also, McElderry, who had worked with Robert from July 2014 to October 2015, was of the opinion that termination of Robert's parental rights was in the children's best interests based on the length of time the children had been out of the home and because Robert had not made sufficient progress to be able to care for the children appropriately.

Upon our de novo review of the record, we affirm the determination of the juvenile court that termination of Robert's parental rights is in the children's best interests. Robert continues to be unable or unwilling to provide stability for his children, and the children need and deserve permanency in their lives. When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id.*

## CONCLUSION

Upon our de novo review of the record, we find that the State presented sufficient evidence to warrant termination of Robert's parental rights. As such, we affirm the order of the juvenile court terminating his parental rights to Jameson, Jozlyn, Jerzi, and Iniyah.

AFFIRMED.