IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF NOAH P.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF NOAH P., A CHILD UNDER THE AGE OF 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ANGELA P., APPELLANT.

Filed January 31, 2023.    No. A-22-518.

Appeal from the County Court for Box Butte County: PAUL G. WESS, Judge. Affirmed.

Andrew M. Pope, of Crites, Shaffer, Connealy, Watson, Patras & Watson, P.C., L.L.O., for appellant.

Marissa L. Curtiss, Deputy Box Butte County Attorney, for appellee.

MOORE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Angela P. appeals the termination of her parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6) and (7) (Reissue 2016). She contends that the Box Butte County Court, sitting in its capacity as a juvenile court, erred in finding that there was clear and convincing evidence to support a statutory basis for termination of her parental rights and that termination was in the minor child's best interests. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Angela is the biological mother of Noah P. who was born in July 2016. Noah's father relinquished his parental rights and is not a part of this appeal.

On April 9, 2020, law enforcement officers went to Angela's home to conduct a welfare check on Noah following a report that Angela, who was caring for Noah, appeared to be under the influence of drugs. After Angela tested positive for oxycodone, benzodiazepine, methamphetamine, and THC, Noah was removed from her care and placed with his maternal aunt and uncle. Noah has remained in out-of-home placement since that time.

On April 10, 2020, the State filed a petition alleging that Noah was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) due to Angela testing positive for oxycodone, benzodiazepine, methamphetamine, and THC while Noah was in her care; threatening to harm herself while Noah was present and in her custody; and admitting that she has medical conditions that required prescribed medications but she refused to take them. The petition was later amended regarding the father, but the allegations against Angela remained the same.

In July 2020, the court adjudicated Noah as a child within the meaning of § 43-247(3)(a) after Angela admitted to the allegations contained in the amended petition. Thereafter, Angela was ordered by the court to participate in a comprehensive psychological evaluation and parent capacity evaluation, to submit to random drug testing, to complete the Circle of Security parenting program, to utilize medication management, and to attend therapeutic visitation with Noah.

In November 2021, the State filed a motion to terminate Angela's parental rights pursuant to § 43-292(2) (neglect), (4) (parental unfitness), (6) (reasonable efforts have failed), and (7) (out-of-home placement has continued for at least 15 out of most recent 22 months), and that termination was in the minor child's best interests.

### 2. TERMINATION HEARING

The termination hearing was held in late February 2022. Witnesses for the State included Jose Benitez and Brooke Sands, Department of Health and Human Services (DHHS) child and family service specialists; Jennifer Lanik, Noah's early childhood special education teacher; Lori Rodriguez-Fletcher, Noah and Angela's child-parent psychotherapist; and Noah's foster mother.

At the time of the February 2022, termination hearing, Noah was 5 years old and had been in out-of-home relative placement for over 22 months. Although Noah was diagnosed with a lazy eye when he was 2 years old, this issue was not addressed until after Noah was placed in foster care. The foster parents took Noah to Colorado to have eye surgery and he has had to wear a patch and wear special glasses. Noah was also scheduled to have "physical vision therapy." Noah's foster mother stated that if Noah's eye issues would have been corrected when he was diagnosed at 2 years old, "we wouldn't be where we are today."

### (a) Caseworker Testimony/Goals and Services Provided

Two caseworkers testified at the termination hearing: Benitez, who was the caseworker from approximately March until August 2021, and Sands who was the caseworker from September 2021 until the termination hearing.

A family strengths and needs assessment identified Angela's ongoing concerns as her continued use of illegal substances, lack of coping skills, mental health issues, lack of a social support system, parenting skills, resource management, and lack of an income to provide safe and stable housing, food, clothing, and other basic needs. Angela's goals included finding and maintaining safe, stable, and clean housing; maintaining sobriety; working with family support;

participating in counseling; identifying a healthy support network; participating in substance use evaluations and following the recommendations; and completing the Circle of Security parenting program.

Services offered to Angela and Noah included case management, monthly family team meetings, weekly family support, supervised visitation and therapeutic visitation, child-parent psychotherapy (CPP), support groups, counseling, appropriate referrals including counseling, medication management, Circle of Security parenting classes, out-of-home relative placement, drug testing, gas vouchers, phone and data cards, and cleaning materials for Angela's home. Sands testified that she could not think of any additional services that could have been provided to Angela and Noah to reunify the family.

Over the course of the case, Angela completed a mental health evaluation, completed a substance use evaluation in January 2021, and entered inpatient drug treatment in June 2021. She also completed the Circle of Security class in December 2021, reported that she had obtained employment at a fast-food restaurant in December 2021, and obtained stable housing with assistance. Despite this, according to both Benitez and Sands, Angela's progress was poor and any progress that she made was intermittent.

Angela failed to complete the parent capacity evaluation, failed to utilize medication management, and was unable to demonstrate continued sobriety. Angela was drug tested on a weekly basis and most of her drug tests were positive for methamphetamines, amphetamines, and THC. After completing residential treatment, recommendations included attending NA or AA meetings and working with a sponsor, attending family therapy in a grief group, continuing with medication compliance, and participating in regular drug testing. Although Angela was released from inpatient treatment in August 2021, she did not start outpatient treatment until December 2021 and she did not complete any of the other recommendations except for regular drug testing. Further, even after completing in-patient treatment, Angela continued to test positive for methamphetamines, amphetamines, and THC. Although the record reflects that Angela had a prescribed medication that could produce false positive results for amphetamines, Angela was not taking any medications that could cause false positive results for methamphetamines and THC.

Additionally, Angela's attendance at CPP sessions was inconsistent and Noah exhibited concerning behaviors after visits with Angela. For 2 to 3 days after visits with Angela, Noah's behavior changed at school as he was described as being "clingy" with teachers, hiding under tables, and hitting classmates at school and his cousins at his foster home. In late October 2021, visitation was suspended by court order.

(b) Therapy

Rodriguez-Fletcher testified that she began working with Noah for 1 or 2 months prior to his removal from Angela's home to address behavioral issues exhibited by Noah including aggression towards Angela. After Noah's removal, Rodriguez-Fletcher received a referral from DHHS and provided CPP to Noah and Angela. She explained that CPP is

> geared towards working with children, age zero to five, and a parent or a caregiver. . . . It specifically is geared [toward] working with children who have experienced trauma or at risk for concerns regarding trauma. It's specifically designed to . . . help the parent and the child work through the trauma as well as provide support, coaching, observation, guidance

to the parent as far as any emotional concerns, behavioral concerns, developmental concerns, safety, obviously, and working towards longing and attachment.

As part of that process, we do a CPP assessment. Depending on the age of the child, for Noah's case, it's what we call a Crowell Assessment that is done to assess the relationship, look for any strengths, needs, that are noted, and then to help develop a treatment plan for them. As a part of that, you work with a parent or a caregiver and also help them [with] . . . their own trauma . . . [or] mental health issues, and so you also work with a parent on stabilizing those at the same time in order to be a safe and protected parent as they help their child . . . heal through that process.

And from there, there's different sessions that go on. In Noah's case, it was working with him, working with Angela . . . and then also working with Noah and his foster placement.

Rodriguez-Fletcher stated that Noah has experienced trauma including neglect as manifested by him showing up at school hungry and dirty. During one intake, needles were found in the home within Noah's reach and on another occasion, Angela threated to kill herself in front of Noah. Rodriguez-Fletcher diagnosed Noah with unspecified trauma, stress-related disorder, and having parent-child relational issues.

Rodriguez-Fletcher testified that Noah does not have a safe and secure attached relationship with Angela and that Noah was "very rejecting" of Angela. Further, she testified that Noah's relationship with Angela is "extremely poor," there has been "no progress" in the case, and Angela does not have the ability to provide Noah with a home that has the permanency, stability, safety, and security that he needs.

### 3. BEST INTERESTS

### (a) Caseworker Sands

Sands expressed concern over the lack of relationship or healthy bond between Angela and Noah. According to Sands:

Noah seems to associate [Angela] with gifts, and that's why he wanted to see her.

If I mention [Angela's] name during a visit with him, he kind of shuts down. It's a very clear trauma response just at the mention of her name, and so that's concerning. And he called her by her first name, and he calls his foster parents "mom" and "dad" and his foster siblings, who are his cousins, he calls his brothers. It's very clear that's his home and I think to rebuild any sort of relationship . . . between Noah and [Angela] would be very lengthy and very hard on Noah.

Sands further expressed that rebuilding Angela and Noah's relationship would require a lot of consistency which had been a struggle for Angela. Sands testified that, in her opinion, Angela's parental rights should be terminated because Noah considers his foster home to be "his home" and that the turmoil of the case is "very hard on him" and "he just needs the permanency and stability of an adoption so that he knows he is safe and secure where he is." She further testified that Angela was not currently capable of being Noah's primary caregiver and that, in her opinion,

it would be best for Noah to be able to find permanency where . . . he identifies his home and where he identifies as his family, where he has healthy bonds . . . as far as for [Angela] to be Noah's primary caregiver, I don't think it's in [Noah's] best interests.

### (b) Noah's Teacher

Lanik taught Noah in her classroom from August 2019 to May 2021. She testified that when Noah was in Angela's care, his school attendance was erratic, he would come to school hungry and gorge himself at lunch, had poor hygiene, and his clothes were so dirty they had to be washed during the school day. She further testified that Noah "was quiet, never smiled. Always wanted to be by my side, . . . kind of clingy, always wanted to be with the adults and didn't want to be with the kids at all." However, after Noah entered the foster care system in 2020, he was "talkative," engaged with his peers, and "wasn't afraid to take risks in his play" such as playing with peers, raising his hand at circle time, and providing information to the group. Lanik further reported that, after Noah's visits with Angela, Noah would revert to clingy behavior and become aggressive. Lanik testified that, in her opinion, it was in Noah's best interests to remain with his foster family.

### (c) Noah's Foster Mother

Noah's foster mother testified that when 3-year-old Noah was originally placed with her, "[h]e was scared all the time. He gorged himself with food all the time. He cried all the time." Specifically, the foster mother stated that Noah was scared of the dark, the car, and the shower. She also explained that Noah was uncomfortable going on visits with Angela and that "he would hold onto your leg or arm. He wouldn't let go. He would cry, scream, just very upset" and that, after visits, Noah's "behaviors were naughty [and he would] cry. He would throw toys. He was just very . . . dysregulated."

Noah's foster mother stated that, after Noah started therapy with Rodriguez-Fletcher, she saw a significant improvement in Noah's behavior:

He's happy. He's always smiling, giggling. He's always going to help you with something. If you want something, he's going to ask if he can bring it to you or put the remote away. He's not so much scared of the dark anymore. He is a normal kid now and just plays right along with the rest of my boys.

Additionally, Noah no longer gorges food, no longer wets the bed, and he is potty-trained. Noah has bonded with his foster family and calls his foster parents "mom" and "dad" and calls his four foster siblings his "brothers." Noah's foster mother opined that it would be detrimental to Noah to have that bond severed and that termination of Angela's parental rights was in Noah's best interests. She stated that she "loves [Noah] with my whole heart. He . . . is one of my boys. He is mine; he is mine."

### 4. COURT ORDER

Following the termination hearing, the court found that the State had proved by clear and convincing evidence the statutory grounds for termination under § 43-292(2), (6) and (7) and that

termination was in Noah's best interests. The court found that the State had not adduced sufficient evidence to establish termination of Angela's parental rights under § 43-292(4).

## III. ASSIGNMENTS OF ERROR

Angela contends that the court erred in terminating her parental rights pursuant to § 43-292(2), (6), and (7) and finding that termination was in the minor child's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

The court found that clear and convincing evidence existed to terminate Angela's parental rights pursuant to § 43-292(2), (6) and (7). Any one of the bases for termination codified in § 43-292 can serve as the basis for termination when coupled with evidence that termination is in the best interests of the child. *In re Interest Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

Section 43-292(7) provides for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." That period of time was set by the Legislature as a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum degree of fitness. *In re Interest of Mateo L. et al., supra.* This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of the parent. *Id.* In other words, if the 15-out-of-22 formula is met, § 43-292(7) is met. *In re Interest of Mateo L. et al., supra.*

Here, Noah was placed in out-of-home placement on April 9, 2020, and had not returned to Angela's care at the time of the March 10, 2022, termination hearing. Thus, Noah had been in out-of-home placement for over 22 months. Angela acknowledges that the State met its burden to show that Noah had been in out-of-home placement for 15 of the most recent 22 months. Because any one of the bases for termination of parental rights codified by § 43-292 can serve as the basis for the termination of parental rights, we need not consider any other statutory bases for termination. See *In re Interest Leyton C. & Landyn C., supra.*

### 2. BEST INTERESTS

Angela next argues that the court erred in finding that termination of her parental rights was in Noah's best interests.

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015); *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

A parent's right to raise his or her child is constitutionally protected; so, before a court may terminate parental rights, the State must show that the parent is unfit. *In re Interest of Jahon S., supra*. There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parents. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id*.

In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al.*, *supra*. The evidence adduced to prove termination on any statutory ground other than § 43-292(7) is highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. See *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005).

Here, Noah was placed in out-of-home placement in April 2019 after Angela tested positive for oxycodone, benzodiazepine, methamphetamine, and THC while caring for Noah; threatened to harm herself while Noah was present; and after her admission that that she had medical conditions that require prescribed medications but she refused to take them. As a result of her condition, Noah was improperly cared for and exhibited signs of trauma which required counseling to work through his condition. Throughout this case, although Angela completed some of her goals such as completing the Circle of Security class, finding employment, and securing safe housing with assistance, she was inconsistent and made poor progress on other goals. She was inconsistent in her attendance at CPP therapy sessions and she did not complete the parent capacity evaluation and continued to test positive for illegal substances despite the services provided to her by DHHS. We find that the record affirmatively establishes by clear and convincing evidence that Angela was unfit to care for Noah.

Further, the evidence established that, since being placed with his foster family, Noah has bonded with them in contrast to Noah having little relationship with, or bonding to, Angela. Noah would become dysregulated after being with Angela or even at the mention of Angela's name. Since being placed with his aunt and uncle, Noah has bonded with his foster family and has progressed from a scared child who gorged himself with food to a happy child who smiles and giggles. Further, Noah is progressing in school from having behavior issues to being a talkative child who engages with his peers and participates in circle time.

Although Angela undoubtedly loves Noah, despite the many services provided to her, she has been unable to place herself in a position to parent Noah. Further, her substance abuse and mental health issues prevent her from being a fit parent and there is no basis in this record to conclude that reunification could be achieved in the foreseeable future. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). We hold there is clear and convincing evidence that termination of Angela's parental rights is in Noah's best interests.

## VI. CONCLUSION

Having found that the evidence was sufficient to support the statutory basis for termination under § 43-292(7) and that termination was in Noah's best interests, we affirm the court's order terminating Angela's parental rights to Noah.

AFFIRMED.