IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF SUSANNAH G.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF SUSANNAH G., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

BEVERLY H., APPELLANT.

Filed July 7, 2020.    No. A-19-950.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

LaShawn D. Young, of Young & Young Attorneys at Law, for appellant.

Natalie Killion, Deputy Douglas County Attorney, for appellee.

PIRTLE, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Beverly H. appeals the order of the separate juvenile court of Douglas County terminating her parental rights and finding that termination was in the minor child's best interests. Her sole claim on appeal is that the juvenile court erred in finding the State proved by clear and convincing evidence that terminating her parental rights was in the minor child's best interests. Based upon the analysis set forth herein, we affirm.

## II. STATEMENT OF FACTS

Beverly is the natural mother of Susannah G. who was born in August 2013. In June 2017, the State filed an adjudication petition alleging Susannah was a child within the meaning of Neb.

Rev. Stat. § 43-247(3)(a)(3) (Reissue 2016) because she lacked proper parental care by reason of Beverly's fault or habits because Beverly had not maintained a clean home, had failed to maintain a usable bathroom in the home and used extension cords and jumper cables to power parts of the home buried in clothes and other flammable items, used drugs and/or alcohol, and failed to provide proper parental care support and/or supervision for Susannah, which placed Susannah at a risk of harm. An ex parte order for immediate custody was entered on June 6 placing Susannah in the custody of the Department of Health and Human Services (DHHS). Susannah has not been returned to Beverly's home during the pendency of this case.

In November 2017, the juvenile court adjudicated Susannah finding her to be within the meaning of § 43-247(3)(a) based on Beverly's admission to the allegation set forth in the adjudication petition that she failed to maintain a clean home placing Susannah at risk of harm. As part of the adjudication order entered November 26, the juvenile court ordered Beverly to complete an Initial Diagnostic Interview (IDI) and follow all treatment recommendations; participate in family support services; maintain safe, adequate housing and provide monthly verification to the case manager; and maintain a legal source of income with monthly verification provided to the case manager. In the November 26 order, the juvenile court allowed Beverly to have supervised visits. Later, in a review and permanency planning order entered May 30, 2018, the juvenile court ordered Beverly to participate with family support services; maintain safe and adequate housing; maintain a stable and legal source of income and provide monthly, written verification thereof; pay child support; and participate in outpatient therapy for her anxiety and provide proof thereof.

### 1. MOTION TO TERMINATE PARENTAL RIGHTS/TERMINATION HEARING

On September 21, 2018, the State filed a motion to terminate Beverly's parental rights alleging statutory grounds pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that termination was in Susannah's best interests. The termination hearing was held on several dates in December 2018 and in May, June, and July 2019.

At the termination hearing, testimony was adduced from visitation workers; family support workers; Susannah's foster mother; Jennifer Aesoph, Susannah's mental health therapist; and family permanency specialists including Katie Linegar (June 2017 to June 2018), Callie Kotschwar (July 2018 to March 2019), and Amanda Gould (February 2019 to termination hearing). The evidence adduced at trial related primarily to Beverly's success or lack thereof in complying with court orders requiring her to (a) complete an IDI and follow all treatment recommendations including participating in outpatient therapy for her anxiety and provide proof thereof; (b) participate in family support services; (c) maintain safe, adequate housing and provide monthly verification; (d) maintain a legal source of income with monthly verification; (e) attend supervised visitation with Susannah; and (e) pay child support.

### (a) IDI and Therapy

The court ordered Beverly to complete an IDI and outpatient therapy at least monthly as recommended by the IDI. Beverly completed the IDI in April 2018. The IDI recommended Level 1 outpatient therapy to address Beverly's anxiety. Despite that recommendation and the fact that one of her family permanency specialists gave Beverly a list of providers for which payment

would be covered by the State and informed Beverly that it was Beverly's responsibility to arrange therapy with a provider, Beverly did not participate in Level 1 outpatient therapy as of June 2018 and did not provide proof that she was participating in Level 1 outpatient therapy as of March 2019. However, toward the end of April 2019, Beverly began attending therapy. Gould described this as a "last-ditch effort" because Beverly did not engage in therapy until April or May 2019, which was after termination proceedings had been commenced. Gould further expressed that Beverly's delay in attending therapy called into question Beverly's motivation to have Susannah placed back in her home.

### (b) Family Support Services

Beverly received family support services commencing in November 2017 and ending in May 2018, and again from April to May 2019. Although her family support worker contacted Beverly weekly starting in November 2017, the worker was unable to meet with Beverly until April 2018 and was only able to meet with her three times. In May 2018, Beverly was unsuccessfully discharged from family support services due to lack of family engagement.

Family support services resumed in April 2019 with weekly meetings working on goals including assisting Beverly to find housing, transportation, and therapy. Although Beverly was aware that she lacked gainful employment which prevented her from reaching the goal of obtaining independent housing, Beverly never increased her work hours nor found a different job. The meetings ended in late May 2019 due to Beverly's failure to confirm meetings.

### (c) Housing

The court also ordered Beverly to obtain and maintain safe and stable housing and provide monthly verification. From June 2017 to June 2018, Beverly was noncompliant with the court order requiring her to obtain and maintain safe and stable housing and provide monthly verification because she was not always engaged with the family support worker; the family permanency specialist was unable to verify Beverly's living situation; and the family permanency specialist was unable to perform a full walkthrough of Beverly's home.

Linegar, who was Beverly's family support specialist from June 2017 to June 2018, explained that Beverly had reported she lived in a home with her sister and only had access to two upstairs bedrooms. In September 2017, Linegar attempted a walkthrough of those two bedrooms, the living room, and the kitchen but was denied access to a third upstairs bedroom and the basement because Beverly claimed she did not have access to those areas of the home. A few days later, Linegar received information from Susannah's foster parent that Beverly and Susannah did have access to the basement of the home and that a man was living in the basement. Linegar testified she attempted another walkthrough of the home in mid-September. During that walkthrough, when she pulled up to the residence, she saw a man "sneak out" the side door and there were men's clothing and a marijuana sign in the basement. Linegar further explained she did not see Beverly's belongings in the home during either walkthrough leading Linegar to believe Beverly did not actually live there. Linegar testified that she deemed the walkthroughs unsuccessful which prevented her from recommending that visits take place in Beverly's home.

From July to October 2018, Kotschwar, who was Beverly's family permanency specialist at that time, was unable to verify Beverly's housing because Beverly would not tell her where she was living. Kotschwar testified that eventually Beverly told her she was living with her mother, which concerned Kotschwar because Susannah had previously been removed from Beverly's mother's care due to allegations of physical abuse. Kotschwar testified that she did not consider Beverly's living arrangement stable, and around October 2018, Kotschwar informed Beverly that Beverly would need to find new housing because living with Beverly's mother prevented Susannah from visiting Beverly or being placed with her. Kotschwar testified Beverly had not found new housing as of March 2019 when Kotschwar left the case.

Gould testified that Beverly had not provided any verification of her housing from February 2019 to the June 2019 hearing. Further, despite discussing with Beverly the need to complete a walkthrough of her living arrangement as a condition of reunification to verify that Beverly had safe and stable housing, Gould was unable to verify Beverly's claim that Beverly was residing with Beverly's mother because Gould was unable to complete a walkthrough of Beverly's residence.

### (d) Legal Source of Income

Regarding the requirement that Beverly maintain a legal source of income with monthly verification, the evidence reflected that Beverly was employed part time. In October 2018, Beverly was referred for assistance in obtaining a stable, legal source of income, but Beverly refused because she believed she could work more hours for her current employer. One of Beverly's family permanency specialists testified that although Beverly has a legal and stable source of income, Beverly's income is inadequate, and Beverly failed to provide monthly proof of employment. The exception occurred during the time period from July 2018 to March 2019, when Beverly provided three paystubs as proof of income; however, Beverly's income was insufficient to support both herself and Susannah if Susannah was placed back in Beverly's home.

### (e) Visitation

Beverly's visitation remained supervised and at a neutral location for the entirety of the case. From June to November 2017, Beverly was allowed three supervised visits with Susannah per week in a neutral location. During that time, the visitation worker described Beverly's attendance as "very off and on" explaining that Beverly's participation ranged from attending 25 percent of the visits 1 month to 75 percent of visits during another month. Due to inconsistent attendance and difficulty with contacting Beverly, Beverly was placed on a "call to confirm" basis. During that time period, Beverly missed 30 out of the 70 visits and was unsuccessfully discharged from visitation services in November 2017 due to inconsistent attendance at visits and because Beverly would not call to confirm her visits as required.

Between July 2018 and March 2019, Beverly was allowed one to two supervised visits per week with Susannah at a neutral location. During this time, there were concerns about Beverly allowing inappropriate contact between Susannah and a male, and more specifically, an incident occurred where Beverly left Susannah unattended with a registered sex offender. Further, the visitation worker testified that in the latter months of 2018, Beverly would send the visitation

worker overnight text messages asking to reschedule visits based upon her work schedule. The visitation worker also noted that Beverly had transportation barriers and, at one point, the worker had seven different phone numbers for Beverly. During this time period, the visitation worker expressed concerns that when Beverly tried to redirect Susannah, Susannah would not listen and Beverly would not follow through with consequences. The visitation worker testified that Beverly was made aware that the fast food restaurant where Beverly worked was not an appropriate place for visits and that a better option would be the YMCA so Susannah could run around; however, Beverly informed him that she could not afford the YMCA drop-in fee. The visitation worker also expressed concerns regarding Beverly's judgement and Susannah's safety. For example, during one visit Beverly wanted to pick mushrooms at Two Rivers State Park, but Susannah was dressed in shorts and sandals. The visitation worker redirected Beverly saying looking for mushrooms in the tall grass, nettles, and weeds was not an appropriate activity because of how Susannah was dressed; however, Beverly responded that it would be fine and if Susannah got stung, Beverly would "rub some mud on it and [Susannah would] be okay." During another visit held at the Elkhorn recreational area, Beverly allowed 4-year-old Susannah to wade in the river.

Finally, during an April or May 2019 visitation, Beverly had a visitor during a visit who was a registered sex offender. This concerned Gould because Beverly was not allowed to have visitors on her visits and because Beverly was allowing a registered sex offender near Susannah.

### (f) Best Interests

Gould testified that terminating Beverly's parental rights was in Susannah's best interests because as of July 2019, she has been in out-of-home care for 23 months; Beverly lacked progress on court orders; Beverly failed to begin family therapy with Susannah; and there were concerns about the safety of Beverly's home. Additionally, Gould testified Beverly associated with a known sex offender who transported Beverly to visits with Susannah.

Aesoph, a mental health therapist, has been Susannah's therapist since April 2018 and has met with Susannah approximately every other week. Aesoph completed Susannah's IDI in April 2018 and diagnosed Susannah with adjustment disorder with mixed anxiety and depressed mood. Aesoph stated she would like Susannah to better regulate her emotions by utilizing more tools, which Aesoph believes would positively impact Susannah's feelings and stress that she experiences when transitioning between visits. Susannah's foster mother testified that she noticed an improvement in Susannah's behavior since Susannah started participating in therapy, explaining that Susannah sometimes uses techniques that she has learned.

### 2. JUVENILE COURT ORDER

The juvenile court entered an order terminating Beverly's parental rights pursuant to § 43-292(2), (6), and (7). Regarding § 43-292(6), the juvenile court specifically found that following a determination that Susannah was a juvenile within the meaning of § 43-247(3)(a), reasonable efforts to preserve and reunify the family under Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2018), under the direction of the court, have failed to correct the following conditions leading to the determination: that Beverly failed to maintain safe and adequate housing and provide verification; that Beverly failed to participate in outpatient therapy and provide proof thereof; and

that Beverly failed to allow a complete walkthrough inspection of her home. The juvenile court dismissed for insufficient evidence the allegations that Beverly had failed to participate in family support services; failed to maintain a legal source of income and provide verification; and failed to pay child support. Finally, the court found that terminating Beverly's parental rights was in Susannah's best interests.

## III. ASSIGNMENT OF ERROR

Beverly assigns that the juvenile court erred in finding the State proved by clear and convincing evidence that terminating her parental rights was in Susannah's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id*.

## V. ANALYSIS

### 1. STATUTORY BASIS FOR TERMINATION

Although Beverly does not contest the statutory basis for the juvenile court's termination of her parental rights, for completeness, we do so. In its order terminating Beverly's parental rights to Susannah, the juvenile court found termination was supported by three separate statutory grounds: § 43-292(2) (parent has substantially and continuously or repeatedly neglected and refused to give juvenile necessary parental care and protection); § 43-292(6) (having determined child was juvenile as described in § 43-247(3)(a), reasonable efforts to preserve and reunify family have failed to correct conditions leading to determination); and § 43-292(7) (child out-of-home for 15 or more months of most recent 22 months). We briefly address termination pursuant to § 43-292(7).

Here, Susannah was removed from Beverly's care and placed in the temporary custody of DHHS on June 6, 2017. At the time the State filed its motion to terminate on September 21, 2018, Susannah had remained in out-of-home care for 15 months and she has not been returned to Beverly's home. Our de novo review of the record shows that grounds for termination of Beverly's parental rights under § 43-292(7) was proved by clear and convincing evidence.

We need not consider whether termination of Beverly's parental rights was proper pursuant to the other subsections of § 43-292 since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

### 2. BEST INTERESTS

Beverly argues the juvenile court erred in finding it was in Susannah's best interests to terminate her parental rights. Specifically, Beverly argues she has shown progress toward

reunification with Susannah and completed several items from her case plan including working with her family support workers, maintaining a legal source of income, completing an IDI, and participating in supervised visits. In her brief, Beverly argues that while her visits were not perfect, "the Court does not require perfection in parenting." Brief for appellant at 17.

In *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 508-09, 933 N.W.2d 873, 887-88 (2019), this court recently stated:

> In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*
>
> The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).
>
> In cases where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

Further, the evidence adduced to prove termination on any statutory ground other than § 43-292(7) is highly relevant to the best interests of the child or children, as it would show abandonment, neglect, unfitness, or abuse. See *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005).

In support of her position that the evidence adduced at the termination hearing did not support the juvenile court's determination that termination was in Susannah's best interests, Beverly cites to *In re Interest of Seth K. & Dinah K.*, 22 Neb. App. 349, 853 N.W.2d 217 (2014), in which we reversed a decision to terminate parental rights due to insufficient evidence that termination was in the children's best interests. In *In re Interest of Seth K. & Dinah K.*, the State argued termination was in the children's best interests because of the mother's prior history with the juvenile court and her lack of sufficient effort during the early stages of the proceedings. In relation to the mother's more recent efforts toward reunification, the State argued those efforts were inconsequential because the mother's behavior fell into a pattern of showing progress when

involved with the juvenile court but failing to sustain that progress when not supervised by the juvenile court. *Id.*

> Based upon our de novo review of the evidence in its entirety, we noted:
> [The mother] presented evidence that . . . she successfully completed an intensive outpatient treatment program for her substance abuse. As a part of that program, [the mother] cooperated with and passed regular drug tests. [The mother]'s prognosis for maintaining her sobriety was considered "excellent." [The mother] had obtained full-time employment, and such employment provided [the mother] with benefits. In addition, [the mother] had completed a parenting class . . . and was successfully applying the lessons she learned from this class to her interactions with [her children]. Visitation workers who supervised visits between [the mother] and the children testified that [the mother] was good with the children, always had fun activities for the three of them to engage in together, and always provided the children with appropriate food and other supplies.

*Id.* at 358, 853 N.W.2d at 224. In deciding the mother's evidence of progress did not warrant a finding of unfitness, this court observed that although the mother still had work to do before reunifying with her children, "we do not require perfection of a parent when deciding whether termination of parental rights is appropriate." *Id.* at 360-61, 853 N.W.2d at 225.

While it is true that perfection of a parent is not required to prevent termination of his or her parental rights, the facts of *In re Interest of Seth K. & Dinah K.* are distinguishable from the present case. Here, the record reflects Susannah was removed from Beverly's care due to Beverly's failure in not maintaining a clean home, failing to maintain a usable bathroom in the home and used extension cords and jumper cables to power parts of the home buried in clothes and other flammable items, using drugs and/or alcohol, and failing to provide proper parental care support and/or supervision for Susannah, which placed Susannah at a risk of harm. Based upon Beverly's admission to the allegation that she failed to maintain a clean home which placed Susannah at risk of harm and, after adjudicating Susannah as a child within the meaning of § 43-247(3)(a), the court ordered Beverly to, among other things, (a) complete an IDI and follow all treatment recommendations including participating in outpatient therapy for her anxiety and provide proof thereof; (b) participate in family support services; (c) maintain safe, adequate housing and provide monthly verification; (d) maintain a legal source of income with monthly verification; and (e) attend supervised visitation with Susannah. Beverly's progress in relation to those court orders paints a remarkably different picture than the record in *In re Interest of Seth K. & Dinah K.*

First, the evidence adduced at the termination hearing established that although Beverly did complete an IDI and she was given a list of mental health providers to choose from which payment would be covered by the State, Beverly never submitted proof to her case managers that she had selected a provider or participated in outpatient therapy as recommended by the IDI. Further, although Beverly did begin attending therapy toward the end of April or May 2019, Gould described this as a "last-ditch effort" because Beverly did not engage in therapy until April or May 2019 which was after termination proceedings had been commenced. Gould further expressed that Beverly's delay in attending therapy called into question Beverly's motivation to have Susannah placed back in her home.

Second, the evidence at the termination hearing established that although Beverly was provided family support services related to assisting her with finding housing, transportation, and therapy, Beverly did not consistently utilize those services and was unsuccessfully discharged from family support services on two separate occasions due to lack of family engagement and failure to confirm meetings.

Third, Beverly failed to maintain safe, adequate housing and provide monthly verification as required by the court. Beverly prevented successful walkthroughs by failing to provide case managers with her current address; not allowing case managers to complete a walkthrough of her housing, including an instance where she claimed not to have access to a basement in her sister's home where the case manager later learned Beverly did have access and a man was living in that basement; and, at one point, Beverly reported living with her mother, which arrangement was deemed inappropriate because Susannah had been removed from Beverly's mother's care due to allegations of physical abuse. Further, although Beverly was aware that she lacked gainful employment which prevented her from reaching the goal of obtaining independent housing, Beverly never increased her work hours nor found a different job.

Fourth, regarding the requirement that Beverly maintain a legal source of income with monthly verification, although the evidence reflected that Beverly was employed part time, her income was inadequate to support both herself and Susannah and she failed to provide monthly proof of employment providing only three paystubs over the course of this case. Further, even though Beverly's income was insufficient to support both herself and Susannah if Susannah was placed back in Beverly's home, Beverly refused a referral for assistance in obtaining a stable, legal source of income because she believed she could work more hours for her current employer.

Fifth, regarding Beverly's visitation with Susannah, the evidence established that her visitation never progressed to unsupervised visits during the pendency of this case and Beverly's participation in visitation ranged from attending 25 percent of the visits 1 month to 75 percent of visits during another month. In addition to her inconsistency in attending supervised visits, case managers testified regarding concerns about Beverly's judgment and Susannah's safety recalling that Beverly allowed Susannah to wade in fast-moving river water, to walk through tall grass and nettles in order to hunt mushrooms when inappropriately dressed, and two incidents where Beverly allowed registered sex offenders to have inappropriate contact with Susannah.

This factual scenario of failing to comply with court orders is more similar to the Nebraska Supreme Court case *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). In that case, the record was replete with references to court orders that required the mother to participate in an outpatient chemical dependency therapy program, to continue submitting to random drug and alcohol testing, to continue participation in outpatient chemical dependency treatment, to attend family and individual therapy, and to continue participating in psychiatric care. *Id.* The court noted the mother had mental health issues but failed to consistently attend treatment to address the problem. *Id.* In reaching its conclusion that termination was in the child's best interests, the court stated:

> Alec deserves permanency. [His mother]'s failure to comply with the court-ordered rehabilitation plan defeated his chance to be reunified with her. At the time of the hearing, Alec had been in the State's care for 21 months. During that time, [his mother] had not

even progressed to being allowed unsupervised visitation with Alec. Because much progress must still be made before [the mother] would be trusted with Alec's care and custody, Alec would be left to languish in foster care for an unknown amount of time with no guarantee of reunification. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. We conclude that the State showed by clear and convincing evidence that termination of [the mother]'s parental rights was in Alec's best interests.

*Id.* at 797-98, 884 N.W.2d at 709.

Here, we are faced with a similar situation. Gould testified that terminating Beverly's parental rights was in Susannah's best interests because Susannah had been in out-of-home care for 23 months as of July 2019, Beverly lacked progress on court orders, and there were concerns about the safety of Beverly's home. Furthermore, Beverly's visitation had not progressed beyond supervised visits. Accordingly, the record establishes that Beverly is unfit and that termination is in Susannah's best interests.

## VI. CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Beverly's parental rights.

AFFIRMED.