IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF SKYLAR J. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF SKYLAR J. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SHERRY W., APPELLANT, AND DUANE W., APPELLEE.

Filed October 4, 2022.    No. A-21-1034.

Appeal from the County Court for Cass County: DAVID J. PARTSCH, Judge. Affirmed.

Michael Ziskey, of Fankhauser, Nelsen, Werts, Ziskey & Merwin, P.C., L.L.O., for appellant.

S. Colin Palm, Cass County Attorney, and Sarah M. Sutter for appellee State of Nebraska.

PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

PIRTLE, Chief Judge.

INTRODUCTION

Sherry W. appeals from an order of the Cass County Court, sitting as a juvenile court, terminating her parental rights to her five children (adopted grandchildren). Upon our de novo review, we affirm the juvenile court's order.

BACKGROUND

Sherry is the legal mother and maternal grandmother of the minor children Skylar J., Bailey J., Kallie J., Izzibella J., and Marlee J., having adopted them following the termination of the parental rights of their parents. Misti J. is the biological mother of the minor children and Sherry's daughter. Duane W. is Sherry's husband and maternal grandfather of the minor children. Although

- 1 -

Duane was married to Sherry at the time of the adoption, he is not the legal father of the minor children. Sherry is the sole legal parent.

On January 16, 2020, the State filed a petition to adjudicate the children, alleging they were within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they lacked proper parental care by reason of the faults or habits of Sherry. The petition further alleged: (1) that on July 10, 2019, Sherry had contact with law enforcement and/or the Nebraska Department of Health and Human Services (DHHS) at her residence. Sherry agreed to remove individuals from her residence who were suspected of using methamphetamine inside the residence following the discovery of drug paraphernalia inside and outside of the residence within the reach of the juveniles; (2) on January 15, 2020, law enforcement executed a search warrant at Sherry's residence in Plattsmouth, Nebraska; (3) during execution of the search warrant, law enforcement located several residents who were in possession of illegal controlled substances and drug paraphernalia; (4) the residence was in an unsafe and unsanitary condition on January 15, 2020; (5) the actions of Sherry and/or the above situation placed the juveniles at risk of harm. A motion for ex parte temporary custody order was also filed and subsequently granted by the court giving DHHS temporary custody of the children for placement in foster care. Following a hearing, an order to adjudicate was entered on June 17, 2020.

On May 21, 2021, the State filed an amended motion for termination of Sherry's parental rights, alleging statutory grounds to terminate existed pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016), and alleging that termination was in the children's best interests. A termination trial was held between August 19 and August 23, 2021.

The evidence at trial showed that DHHS initially became involved with Sherry and the children on June 30, 2019, when it received an intake regarding Sherry's residence. Among the concerns listed in the intake were the cleanliness of the home and drug use by people living in the home.

On July 5, 2019, Doug White, a DHHS Children and Family Services Specialist, contacted Sherry at her residence and informed her of the reason for his visit. Sherry told White that only her and her children were living in the home. White observed the house to be physically safe for the children.

White returned to the residence again on July 8, 2019, due to another report regarding the cleanliness of the home. White testified that the house looked "like a party had taken place and hadn't been cleaned up." Sherry's explanation for the condition of the home was that the kids had been messy. White testified that he discussed with Sherry the possible consequences of having an unsanitary home and having people in the home that were using drugs. Sherry was very cooperative with him and told him she did not want to lose the children. Sherry further indicated she was unaware that anybody in the home was using drugs, and would make sure it did not happen again.

On July 10, 2019, law enforcement executed a narcotics search warrant at Sherry's residence. During the search, law enforcement located several used syringes inside and outside of the residence. One of the syringes tested positive for the presence of methamphetamine by the Nebraska State Patrol lab. Law enforcement determined that in addition to Sherry and the five minor children at issue, several other individuals were living in the residence, including Duane, Misti, Misti's boyfriend, Kevin C., Amanda C., and Kevin and Amanda's two minor children. Some of these individuals admitted to being methamphetamine users and admitted to using

methamphetamine recently. Sherry admitted to knowing a few of the individuals living in the house were using methamphetamine and agreed to remove those individuals from the residence.

DHHS Children and Family Services Specialist Wendy Stevenson (Wendy) performed a follow-up walkthrough in July 2019. Wendy testified the home was clean at that time. Wendy also testified she had a discussion with Sherry about the individuals who were living in the home and that continuing to allow drug users in the home was going to cause issues for Sherry. Wendy implemented voluntary family support services for Sherry at that time, aimed at working on budgeting, managing finances, and ensuring the home was safe and clean for the children.

White testified that Sherry was cooperative with family support. White visited the home on August 9 and August 30, 2019. He observed the home to be clean during both visits. Again, on August 9, White had a conversation with Sherry in which he told her that in order to make sure the children were safe, people who use drugs should not be living in the home or be around the home. Sherry indicated she understood and was very open and cooperative with White.

At White's visit on August 30, 2019, Sherry indicated she was more than willing to keep "the wrong people" out of the home and to maintain the cleanliness of the home. The voluntary services ended August 31.

In late October 2019, another intake was received that involved Sherry's residence. This intake involved Amanda, Kevin, and their two minor children, with allegations similar to the prior intakes – that the home was unclean, drug needles had been found outside by one of the children, and that there were drug users in the home. White observed the home to be cleaner than when he left the residence in August. Sherry told him that Kevin was not living in her home, but Amanda was living there. White had previous knowledge of Kevin and had concerns that Kevin was one of the individuals using drugs in the home.

On December 2, 2019, White again returned to Sherry's home. He made contact with Sherry and observed the home to be clean. Sherry again told White that Kevin was not living at the home. White testified that during both of the October and December visits, he had further conversations with Sherry about the type of people who should and should not be in the home and around the children. Sherry indicated that she understood.

On January 15, 2020, law enforcement returned to Sherry's residence to investigate a report concerning the safety, welfare, and well-being of the children at issue. Sherry reported 14 people were living inside the residence – 7 minor children and 7 adults, most of whom were the same individuals living in the home in July 2019. Misti's boyfriend was no longer living in the home, but Sherry's adult son, Kristian, and his girlfriend were now living in the home. The residence was littered with trash and debris, the downstairs bathroom was unsanitary, the kitchen had rotting food, trash, dirty clothes, and dirty dishes, and cockroaches were found throughout the home. Methamphetamine and marijuana items were found inside the bedroom of Kevin and Amanda, within the reach of and accessible to Amanda's minor children. Duane was found to be in possession of marijuana and paraphernalia and admitted to using marijuana the night prior. Kristian was found in possession of controlled substances and two used syringes. Misti admitted to using methamphetamine within the last week and using alcohol daily. Kevin admitted to using marijuana the night before, but denied using methamphetamine. Based on the conditions of the home and the suspected drug use inside the residence, the children were removed from the home and placed in the custody of DHHS.

Wendy also responded to the home on January 15, 2020. She testified that the home was in "very bad shape, disarray" and the kitchen was "disgusting." There were dishes and food "all over the place" in the kitchen and trash all over the floor. There were flies, cockroaches, and bed bugs in the home.

During the next month or two, Wendy returned to Sherry's house three to four times. During those visits, Wendy discussed case plan goals with Sherry and what needed to be done in order for Sherry to reunify with the children. Wendy testified she had the same conversation with Sherry as she did in July 2019 about not allowing individuals who use drugs in the home and the need to keep the home clean. Sherry acknowledged knowing that drug users could not be in the home but said she did not know how to get them out of the house. Wendy further testified that during forensic interviews, the children talked about observing drug use in the home.

Robin LaPage was assigned to provide family support services to Sherry between January and March 2020. She testified that the main goals were to get the house cleaned up and to keep people out of the home Sherry did not want there. LaPage testified Sherry started making improvements on the condition of the home, but there were still cockroaches and bed bugs in March 2020.

LaPage testified that Duane was living in the home during the time she was providing family support. LaPage had conversations with Sherry regarding Duane's drug and alcohol use. Sherry acknowledged Duane was an alcoholic and used illegal drugs and needed treatment. Sherry encouraged him to obtain a chemical dependency evaluation. Sherry also told LaPage she would have Duane move out or she was going to get a home for just herself and the girls if Duane did not get a chemical dependency evaluation.

Case management duties transferred from Wendy to Robin Stevenson (Robin) on February 25, 2020. Robin's first meeting with Sherry at her home was in May 2020. By that time, Sherry had hired an exterminator and bed bug issues had been resolved.

Robin testified a family team meeting occurred every month since she became the case manager, with the exception of June 2021. At the September 2020 team meeting, Robin observed that Sherry "kind of had a fat lip." When Robin asked what happened, Sherry stated she was having an argument with Duane and he "had put his hand over her mouth," which caused the lump on her lip.

At the time of the September 2020 team meeting Duane had obtained a chemical dependency evaluation that recommended inpatient residential treatment. Duane had already been in three different treatment centers and had left all three without completing treatment.

At the December 2020 meeting, there still had been no progress made relating to the two biggest needs of the family – housing and Duane's sobriety. Robin testified that every month she tried to motivate Sherry and Duane to make phone calls to find different housing and treatment options for Duane, but they would return the following month with no progress.

Robin testified that during the time she was assigned to the case Sherry recognized Duane needed treatment and was adamant that if it meant "kicking Duane to the curb" to get the children back, she would kick him out. She acknowledged to Robin that Misti and Kristian had their own substance abuse issues that needed to be addressed and until those issues were addressed, the presence of Misti and Kristian around the children posed a potential safety risk.

Duane became ill in December 2020 and was diagnosed with stage four liver failure. Robin learned in February 2021 that Duane needed a liver transplant. Duane was told he needed to be sober for six months before the transplant could occur.

Chelsea Mayfield was the visitation worker assigned in January 2020 to supervise visits between Sherry and the children. Mayfield supervised the visits until June 2021. Following removal, visits took place at the public library because there were bed bugs in Sherry's home and other individuals were still living in the home. Starting in March 2020, visits were done by video conferencing due to the COVID-19 pandemic. Mayfield testified once COVID precautions were eased and in-person visits were allowed to resume, there were still safety concerns present in Sherry's home, so virtual video visits continued. Supervised visits at Sherry's home started in July or August.

Mayfield testified about an occasion where Duane came home inebriated during a visit with the children at Sherry's home. Mayfield stated Duane banged on the door, "barreled" his way into the home, and "scared everyone." Mayfield could smell alcohol on his breath and described him as being "very childlike" and slurring his words. Mayfield told Duane he needed to leave and he eventually did leave.

Mayfield also noted Sherry had difficulty setting and maintaining boundaries with the children, and did not like it when Mayfield would redirect her. Mayfield eventually told Sherry she was no longer going to offer redirection, she was only going to document it when Sherry was not following an appropriate guideline.

Mayfield also provided family support services to Sherry during the same timeframe she supervised visits – January 2020 to June 2021. The main goal initially was getting the house to a suitable state. Other goals included accessing community resources, budgeting/money management, finding and maintaining employment, and assisting Duane with obtaining sobriety. Sherry was not employed when Mayfield initially began working with the family, but eventually obtained part-time employment for a brief period of time.

Mayfield testified that Duane's sobriety was the topic of almost every family support meeting in which Duane was present. Mayfield had what she described as "some very difficult conversations" with Duane. Sherry expressed concern that Duane's drug and alcohol addiction was going to interfere with her ability to have the children return to her care. She repeatedly told Mayfield she would not let Duane back in the home until he completed treatment. However, Duane was living with Sherry at the time Mayfield's services terminated in June 2021. Mayfield noted this was yet another example of Sherry's inability to adhere to boundaries.

Mayfield testified that Sherry and the children have a bond. She also testified that Sherry is a good grandma to the children, but did not believe she is able to handle being a parent to the children.

In January 2021, law enforcement came to Sherry's residence with an arrest warrant for Kristian. Kristian was found hiding in Sherry's home and was placed under arrest. Syringes were found on his person following a search. Mayfield testified she had several conversations with Sherry in the months prior to Kristian's arrest in which Sherry knew Kristian was "wanted" and "on the run."

Sherry moved to an apartment in Wahoo in February 2021. Robin met with Sherry at her residence in Wahoo shortly after she moved. Sherry represented to Robin that she was the only

one living in the apartment at that time. However, by the time of the family team meeting in March 2021, Duane had moved into the apartment with Sherry.

At the time of trial, family support services were still occurring and the focus continued to be on Duane's sobriety. Duane still had not completed a treatment program. Robin testified that throughout her involvement with the case, Duane consistently tested positive for methamphetamines and amphetamines. His last drug test was July 22, 2021, a month before trial, and it was positive for illegal drugs. Visitation between Sherry and the children remained fully supervised.

Robin testified that in her opinion, it was in the children's best interests to terminate Sherry's parental rights due to a "lack of long term sustainability" and Duane's lack of sobriety.

Ashley Attoungble, Sherry's therapist, testified that she diagnosed Sherry with dependent personality disorder, depression, and anxiety. According to Attoungble, Sherry is co-dependent, a characteristic of dependent personality disorder, which means she has a high drive to care for others and a desire to be needed. It also means she carries unreasonable relationship expectations, enables negative behaviors of the other person in the relationship, and provides resources, such as housing, food, and money, to others even if it is to her own detriment. Attoungble testified that this is especially true of Sherry in her relationships with Duane, Misti, and Kristian. Her co-dependency leads her to a denial or justification of issues and minimization of the severity of Duane's addictions. Another characteristic of dependent personality disorder that Sherry possessed, according to Attoungble, was the inability to establish boundaries or maintain boundaries in a relationship, again primarily with Duane and her adult children. Attoungble testified that a co-dependent relationship between husband and wife can lead to children's needs not being met and the children observing and modeling unhealthy relationships.

Sherry had been in individual counseling working on her co-dependency issues for more than six months. Attoungble testified that improvement and symptom relief occurs after three months on average. She testified that Sherry has not completed her treatment plan goals, and Attoungble had seen only a slight improvement in Sherry's condition.

The three oldest children also testified. Skyler, age 14, testified that she would like to live with Sherry, but not if everything would be the same as before the children were removed from the home. Specifically, she indicated that she did not want other people living with them. Bailey, age 12, testified there were "no problems or worries" prior to the removal from Sherry's home. She replied "I don't know" when asked if she had any feelings about living with Sherry, but then stated she would like to live with Sherry because "she's my grandma." Kallie, age 10, did not share any preference of where she wanted to live, and indicated that the house was not dirty and there were not any problems when they lived with Sherry.

Sherry testified that Duane lives with her in Wahoo and that he moved in about a month after she moved there. She acknowledged that Duane had been in four residential treatment facilities but had not completed any treatment. Sherry also admitted that shortly before trial he was still using drugs. She indicated that she understood Duane's drug and alcohol use was the main issue in the case and yet he was still living with her. Sherry further testified that Duane was going to be moving out either that day or the next day, and she was not going to allow him back in her apartment until he completed treatment.

Sherry also testified that she loves her grandchildren "more than anything in this world." She stated that terminating her parental rights was not in the children's best interests because she is the one person who has been in their lives since the day they were born. She testified that she provides the children stability and they know they can count on her. She also noted that they have already lost their biological mother.

Following trial, the juvenile court entered an order terminating Sherry's parental rights finding that the State proved by clear and convincing evidence that statutory grounds to terminate existed based on § 43-292(2), (6), and (7), and that termination was in the children's best interests. Sherry subsequently filed a motion for new trial, or to alter or amend judgment, which was denied.

## ASSIGNMENTS OF ERROR

Sherry assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that (1) statutory grounds existed to terminate her rights based on § 43-292(2), (6), and (7); and (2) termination was in the children's best interests and that she is an unfit parent.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

*Statutory Grounds for Termination.*

Sherry assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that statutory grounds existed to terminate her parental rights. For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019), *review denied* (Sept. 26, 2019). The State must prove these facts by clear and convincing evidence. *Id.*

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(2), (6), and (7). Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Becka P. et al., supra.* In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Becka P. et al., supra.*

In the present case it is undisputed that the children have been in out-of-home placement for 15 or more months of the most recent 22 months. The children were removed from Sherry's home on January 15, 2020. At no time have the children been returned to Sherry's care. The State filed its amended motion for termination of parental rights on May 21, 2021, and the termination trial concluded on August 23. When the amended motion for termination was filed, the children

had been out of the home for 16 months. By the last day of trial the children had been out of the home for 19 months. Therefore, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al., supra.* Because we conclude that the State presented clear and convincing evidence that grounds to terminate existed under § 43-292(7), we need not address the other statutory grounds.

*Best Interests.*

Sherry next assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that it was in the children's best interests to terminate her parental rights and that she is an unfit parent.

Under § 43-292, in addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests' analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

In cases where termination of parental rights is based on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019), *review denied* (Sept. 26, 2019). The evidence adduced to prove termination on any statutory ground other than § 43-292(7) is highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. See *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005).

Sherry argues that the State failed to prove by clear and convincing evidence that terminating her parental rights was in the children's best interests because she has "substantially complied with the case plan and substantially corrected the issues that brought the children under the jurisdiction of the court." Brief for appellant at 29. The two issues that brought the children

under the juvenile court's jurisdiction were the unsafe and unsanitary condition of Sherry's home and allowing individuals who were using drugs to live in her home.

Based on the record before us, at the time of trial, the issue with the cleanliness of the home seems to have been resolved. However, the issue with having drug users in the home has not been resolved. Throughout the case, and even before the petition to adjudicate was filed, Sherry had been told that she cannot allow individuals who were using drugs to live in her home. Sherry indicated to various service providers that she understood and would not allow drug users to live in her home. There has been some improvement in her housing situation, in that Misti, Kristian, and Kevin were no longer living with her. However, her husband Duane, an alcoholic and drug user, was still living with her at the time of trial. Sherry testified that Duane moved into her apartment in Wahoo about a month after she relocated there. She testified that he was still living there at the time of trial. She claimed he was moving out the same day as her testimony or the next day, and that she would not let him return until he completed a substance abuse program. However, we cannot confirm on the record before us that Duane did in fact move out. Regardless, Duane was living with Sherry at the time of trial and the evidence showed that he was still using drugs.

Duane completed a chemical dependency evaluation sometime prior to September 2020 that recommended residential treatment. At the time of trial, he had been in at least four chemical dependency programs but had failed to complete any of the programs. Robin testified that throughout her involvement in the case, Duane consistently tested positive for methamphetamines and amphetamines. His last drug test was July 22, 2021, a month before trial, and it was positive for illegal drugs. It does not seem that Duane has any desire to stop using drugs. Even his serious health issues have not prompted him to get sober. He has needed a liver transplant since February 2021 and he was told he needed to be sober for six months before the transplant could occur.

Throughout the case, Sherry has consistently been told that having Duane live in the home when he had not completed treatment was an impediment to reuniting with the children. Duane's sobriety was the topic of almost every family support meeting. At the time of trial, family support services were still occurring and the focus continued to be on Duane's sobriety.

Sherry indicated that she knows Duane is an alcoholic and drug user and needs treatment. Sherry claimed that she was willing to do whatever it took to get the children back, including not allowing Duane to live with her and the children. Robin testified that during the time she was assigned to the case Sherry recognized Duane needed treatment and was adamant that if it meant "kicking Duane to the curb" to get the children back, she would kick him out. Sherry also expressed concern to Mayfield that Duane's drug and alcohol addiction was going to interfere with her ability to have the children return to her care. She repeatedly told Mayfield she would not let Duane back in the home until he completed treatment. However, despite her statements that she would not live with Duane so she could get the children back, she has failed to follow through. As previously stated, Duane was living with Sherry at the time of trial.

Sherry has also been diagnosed with dependent personality disorder, which in part, involves a co-dependency characteristic leading her to a denial or justification of issues and minimization of the severity of Duane's addictions. It also results in unreasonable relationship expectations, enabling negative behaviors of the other person in the relationship, and providing resources to others even if it is to her own detriment. Another characteristic of dependent personality disorder that Sherry possesses, according to Attoungble, is the inability to establish

boundaries or maintain boundaries in a relationship, primarily with Duane and her adult children. Attoungble testified that a co-dependent relationship between husband and wife can lead to children's needs not being met and the children observing and modeling unhealthy relationships. Attoungble testified that on average, improvement and symptom relief for dependent personality disorder occurs after three months, yet she had only seen a slight improvement in Sherry's condition after six months.

The children were removed from Sherry's care in January 2020 and have remained in foster care since then. In the past two and half years Sherry has failed to put herself in a position to properly parent the children. She has consistently and repeatedly been told throughout the case that Duane could not live with her if he did not get treatment, if she wanted any chance at reunification with the children. She has failed to comply with this requirement.

There is no question that Sherry loves the children and that there is a bond between them. Sherry has been a part of their lives since they were born. However, Sherry has not shown a willingness to put the children above her relationship with Duane, after repeatedly indicating she would do so. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

We find there was clear and convincing evidence to show that Sherry was unfit and that terminating her parental rights was in the children's best interests.

CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Sherry's parental rights existed under § 43-292(7) and that termination of her parental rights was in the children's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.