IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF NEVAEH W. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF NEVAEH W. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MICHAEL W., APPELLANT.


Filed November 12, 2024.    No. A-24-145.


Appeal from the Separate Juvenile Court of Lancaster County: ROGER J. HEIDEMAN, Judge. Affirmed.

Jonathan M. Braaten, of Anderson, Creager & Wittstruck, P.C., L.L.O., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Danielle M. Kerr for appellee.


PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

## INTRODUCTION

Michael W. appeals the order of the separate juvenile court of Lancaster County terminating his parental rights to his daughter, Nevaeh W. Upon our de novo review, we affirm the juvenile court's order.

## BACKGROUND

In May 2023, the State filed a supplemental petition pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), to adjudicate Nevaeh, born April 2012, based on allegations against Michael.

In July 2023, the State filed an amended supplemental petition alleging Nevaeh lacked proper parental care by reason of the faults or habits of Michael, and/or was in a situation

- 1 -

dangerous to life or limb or injurious to the health or morals due to: prior adjudications in 2013, 2019, and 2020; Michael's post-release supervision being revoked resulting in him being incarcerated from November 3, 2022, to February 3, 2023; Nevaeh being placed in the temporary legal and physical custody of the Department of Health and Human Services (DHHS) again in March 2023 after her brother died from injuries he received in the home where Nevaeh was residing with her mother; Michael's inability to financially provide safe and stable housing for Nevaeh; and the above allegations placed Nevaeh at risk of harm. The juvenile court adjudicated Nevaeh on July 6, 2023.

Michael was ordered to participate in family support services, family therapy, a psychiatric evaluation, and supervised parenting time. He was also ordered to complete residential treatment and comply with all recommendations, obtain and maintain safe and stable housing and a legal source of income for himself and Nevaeh, not possess or consume alcohol and drugs, and participate in random drug and alcohol testing.

On September 29, 2023, the State filed a motion to terminate Michael's parental rights to Nevaeh. The State alleged Michael substantially and continuously or repeatedly neglected and refused to give Nevaeh necessary parental care and protection based on Neb. Rev. Stat. § 43-292(2) (Reissue 2016), and that termination of Michael's parental rights was in Nevaeh's best interests. A hearing on the motion to terminate was held in January 2024.

The evidence at the termination hearing set out Nevaeh's long history with the juvenile court dating back to 2013. Nevaeh was first adjudicated in December 2013, when she was 1 year old, based on allegations against Michael and her mother. Michael testified he was in a relationship with Nevaeh's mother at the time and Nevaeh was adjudicated because there was marijuana in the home.

The juvenile court terminated its jurisdiction over Nevaeh in April 2017, returning Nevaeh to her mother's care, but finding that Michael had not corrected the conditions that led to adjudication as to him.

In September 2019, Nevaeh was adjudicated as to her mother and removed from her mother's care. In May 2020, Nevaeh was adjudicated regarding allegations against Michael. Michael had been incarcerated since October 2017 based on convictions for shoplifting, possession of controlled substances (methamphetamine), and obstructing a peace officer. He was released on July 6, 2020, and has been on post-release supervision since then. He did not have any contact with Nevaeh during the time he was incarcerated.

In December 2021, the juvenile court found that Michael had successfully completed the rehabilitative plan and it placed Nevaeh with him.

In April 2022, Michael was incarcerated for 2 days, and in July, he was incarcerated for 4 days, both times for custodial sanctions due to violations of his post-release supervision. He testified that his girlfriend was home with Nevaeh during these times.

In November 2022, Michael violated his post-release supervision orders by failing a drug test. As a result, his post-release supervision was revoked and he was incarcerated from November 3, 2022, until February 3, 2023. Nevaeh went back to living with her mother, where she remained until March 2023, when she was removed from her mother's care.

When Michael was released from jail on February 3, 2023, he went to live at a halfway house where he was unable to take placement of Nevaeh. In June, Michael relapsed on methamphetamine.

The amended supplemental petition to adjudicate Nevaeh as to Michael in the present case was filed on July 5, 2023. Michael spent a week in jail from July 5 through July 12 related to his post-release supervision. He subsequently received another custodial sanction when he was charged with trespassing and "disruption." The charges were dismissed, but he went to jail from August 3, 2023, to October 11, 2023. Upon his release from jail, he started inpatient treatment where he stayed from October 12, 2023, to December 18, 2023. During treatment he was being tested for drugs once or twice per week and all tests were negative.

After completing inpatient treatment in December 2023, Michael moved into a halfway house, where Nevaeh could not be placed with him. He was still living at the halfway house at the time of the termination hearing.

Paityn Alberti, the case worker for Nevaeh's case from April 2023 to January 2024, testified that until the middle of May 2023, Michael was submitting to drug tests three times per week and all tests were negative. Sometime in May, Michael lost contact with her and stopped submitting to drug testing. His next drug test was on July 13, 2023, and it was positive for opiates and THC.

Alberti testified that she set up visits between Michael and Nevaeh in March 2023. Michael had about three visits before he lost contact with Alberti in late May and stopped participating in visits. Michael later got back in contact with Alberti and she again set up visitation. Michael had a visit on July 28 and then went to jail on August 3. He had not had any visits since the July 28 visit.

Michael told Alberti he did not attend visits in May and June 2023 because he had relapsed. He also told her he was living with people who were using illegal drugs and he did not want to bring Nevaeh around those people.

Alberti testified that during Michael's inpatient treatment in October to December 2023, he participated in group and individual therapy, drug tests, which were all negative, a psychiatric evaluation, and he was prescribed medication. She stated that Michael was compliant with all recommendations from his treatment providers. DHHS was also trying to set up therapeutic visits with Nevaeh's therapist during this time. Michael met with Nevaeh's therapist two times in November 2023 to start the process for therapeutic visits with Nevaeh. Alberti testified that after those two sessions, Michael and DHHS both had difficulty getting in touch with Nevaeh's therapist so DHHS decided to set up its own supervised visits. The visits were set to begin December 8, 2023, but no visits took place because Nevaeh refused to attend visits with Michael.

Alberti testified that Nevaeh had only lived with Michael for two short periods during her lifetime. The first was from the time she was born in April 2012 until sometime prior to the first time she was adjudicated in December 2013. The second period was when the juvenile court placed Nevaeh with Michael in December 2021. Alberti testified that Michael has been unable or unwilling to provide placement and care for Nevaeh except for 1 or 2 years of her life and the reason for that was due in large part to incarceration and substance abuse.

Sabina Hardesty, Nevaeh's individual and family therapist, testified she started working with Nevaeh in May 2023 and her living situation was uncertain and she had been through

"ongoing extreme trauma." Hardesty stated that based on the trauma, Nevaeh believed the parents are not safe and not consistent. She added that Nevaeh dysregulates very easily because of the uncertainty in her life.

Hardesty testified that she met Michael the first time on Zoom and then had two in person sessions with him in November 2023. The purpose of the sessions was to talk about a plan and the process for repairing his relationship with Nevaeh. Hardesty testified that Michael did not fully understand the extent of Nevaeh's trauma. She also testified that Michael told her that substance abuse had been a long, ongoing, off-and-on issue for him. Hardesty noted it is hard to know if he will ever achieve long-term sobriety.

Hardesty testified that Michael's history of instability caused her concern because Nevaeh needed an "attuned, present, consistent, stable caregiver" to help repair her view of the world and her need for safety. She further stated Nevaeh needs consistency and predictability from her caregivers. She testified that children find safety in structure, predictability, and consistency. She explained to Michael that Nevaeh needed consistency from him to heal and strengthen their relationship.

Hardesty testified that if Nevaeh had another placement disruption it would strengthen her belief that the world is not safe and adults are not predictable and it could potentially affect all areas of her life. She stated that achieving permanency sooner rather than later was important for Nevaeh because the uncertainty of where she would be long term kept her in a dysregulated state.

Nevaeh has been placed with her maternal uncle, Brandon Cook, since July 2023. Her two younger half-sisters who have the same mother as Nevaeh, but not the same father, are also placed with Cook. Hardesty testified that there is a sibling bond between the three girls and it is an important bond for Nevaeh. Hardesty testified that Nevaeh has told her that she wants to stay with her sisters. She also testified that other than when Nevaeh lived with Michael from December 2021 to November 2022, she has always lived in the same place as her sisters. Hardesty also stated that being able to stay with her sisters was important for Nevaeh's therapeutic work.

Addison Hillman, who took over as the case worker on January 4, 2024, testified that Michael did not have safe and stable housing for Nevaeh because he was still living at the halfway house. She testified that he was continuing to participate in drug testing arranged through probation.

Hillman testified DHHS was in support of "timely permanency" for Nevaeh. She stated that when the juvenile cases are considered together, Nevaeh has had an open case with DHHS for 6 or 7 years, or over half her life. Throughout this time, DHHS had offered and/or provided services to Michael. Hillman testified that Michael has achieved sobriety and stability in the past and then lost it again. She testified that even if Michael was able to provide housing immediately and visitations would start again, it would still take months to work toward reunification. At the time of trial, Michael had a year left of post-release supervision.

Michael testified that his goal was to move out of the halfway house in the next 30 days. He was working a full-time job at the time of the termination hearing, and his last positive drug test was in July 2023.

Michael testified he was in a "different place" at the time of the termination hearing than he was when the present juvenile case first started. He stated he had completed treatment, had a

mental evaluation, was taking medication, had a sponsor, was consistent with therapy, and was going to four to five meetings per week.

Michael testified that the last time he saw Nevaeh was July 2023. He agreed that Nevaeh had been under the juvenile court's jurisdiction for 6½ years of her 12 years of life.

## ASSIGNMENTS OF ERROR

Michael assigns the juvenile court erred in (1) finding the State proved by clear and convincing evidence that he had substantially and continuously or repeatedly neglected and refused to give Nevaeh necessary parental care and protection and (2) finding the State proved by clear and convincing evidence that it is in Nevaeh's best interests to terminate his parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Quiotis C.*, 32 Neb. App. 932, 9 N.W.3d 224 (2024). When the evidence is in conflict, however, an appellate court may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

*Statutory Grounds for Termination.*

Michael first assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that statutory grounds existed to terminate his parental rights under § 43-292(2). For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019), *review denied* (September 26, 2019). The State must prove these facts by clear and convincing evidence. *Id.*

Section 43-292(2) provides for termination of parental rights when "parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection." Past neglect, along with facts relating to current family circumstances—which go to best interests—are all properly considered in a parental rights termination case under § 43-292(2). *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). *In re Interest of Gabriel B., supra*. A parent neglects a child by failing to put himself or herself in a position where the child can be placed in the parent's care, in the same manner as a parent who improperly cares for a child in his or her care. *Id.*

The evidence showed that Michael has not put himself in a position to provide Nevaeh parental care and protection for most of her life. She was born in April 2012 and adjudicated the first time in December 2013 because there was marijuana in the home. That juvenile case was closed in April 2017, but the court found Michael had not corrected the conditions that led to the adjudication as to him. Michael did not put himself in a position to provide Nevaeh care and protection from December 2013 to April 2017.

In October 2017, Michael was incarcerated for multiple offenses, including possession of methamphetamine. He was released in early July 2020 and has been on post-release supervision since then. He did not have any contact with Nevaeh during the time he was incarcerated.

In May 2020, Nevaeh was adjudicated a second time regarding allegations against Michael. In addition to finding Michael never corrected the conditions that led to the 2013 adjudication, the juvenile court found that when Nevaeh was adjudicated in September 2019 as to her mother, Michael failed to place himself in a position to parent Nevaeh because of his incarceration.

In December 2021, the court placed Nevaeh with Michael. He went to jail for a few days in April 2022 and July 2022 during the time Nevaeh was placed with him. In November, Michael's post-release supervision was revoked and he was incarcerated from November 3, 2022, until February 3, 2023. When he was released, he went to live at a halfway house where he was unable to take placement of Nevaeh.

Michael started having visits in March 2023, but in June 2023, he had relapsed on methamphetamine and stopped attending visits. He was in jail for a week in July and was again incarcerated from August 3, 2023, to October 11, 2023. Upon his release from jail, he was in inpatient treatment from October 12, 2023, to December 18, 2023. After completing inpatient treatment, Michael moved into a halfway house, where he was again unable to take placement of Nevaeh. He was still living at the halfway house at the time of the termination hearing and, therefore, unable to provide safe and stable housing for Nevaeh. Accordingly, between November 2022 and January 2024, he did not put himself in a position to provide care and protection for Nevaeh.

Michael has failed to put himself in a position to take placement of Nevaeh or to provide parental care for her due to his history of drug use, criminal activity, violations of post-release supervision, and inability to provide appropriate housing. Since Nevaeh's first adjudication in 2013, Michael has only had physical placement of her for about a year. She has spent more than half her life under the jurisdiction of the juvenile court.

We conclude the juvenile court did not err in finding the State proved by clear and convincing evidence that Michael substantially and continuously or repeatedly neglected to give Nevaeh necessary parental care and protection. Michael's first assignment of error fails.

*Best Interests.*

Michael next assigns that the juvenile court erred in finding that the State proved by clear and convincing evidence that it was in Nevaeh's best interests to terminate his parental rights. Under § 43-292, in addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of

a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.*

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.* In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

The evidence adduced to prove termination on any statutory ground other than § 43-292(7) is highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. See *In re Interest of Shelby L.*, 270 Neb. 150, 699 N.W.2d 392 (2005).

As previously discussed, over the course of Nevaeh's life, Michael has not put himself in a position to take placement of Nevaeh or to provide parental care for her due to his history of drug use, criminal activity, violations of post-release supervision, and inability to provide appropriate housing.

Michael most recently tested positive for drugs in July 2023. He admitted to Hardesty that he had struggled with substance abuse for a long time. Although he has now completed in-patient treatment, there is no way to know if he will ever achieve long-term sobriety. Further, as Hillman testified, even if Michael was able to provide housing immediately and visitations would start again, it would still take an unknown amount of time before reunification would occur.

Other than just after she was born, Nevaeh has only been placed with Michael for about a year of her life. In addition to Nevaeh having limited placement with Michael, Michael has had limited visitation and contact with Nevaeh over the years. The lack of contact was due in part to the fact that he has been in and out of jail and has failed to comply with his post-release supervision orders. Michael's last visit with Nevaeh was July 28, 2023. When visits were scheduled to start again in December 2023, Nevaeh did not want to have visits with Michael.

At the time of the termination hearing, he still had a year left of post-release supervision and he did not have housing for Nevaeh.

Nevaeh has had to deal with trauma and instability most of her life. Since 2013, when she was 1 year old, she has been placed back and forth between her mother's house, foster care, and her father's home. At the time of the termination hearing, she was almost 12 years old. The juvenile court has been involved with Nevaeh for 6 or 7 years, or over half her life.

The trauma and instability have caused Nevaeh to believe that parents are not safe and not consistent. Hardesty testified that Nevaeh needs structure, consistency, and predictability from her caregivers to make her feel safe. She testified that another placement disruption for Nevaeh could potentially affect all areas of her life. She stated that achieving permanency soon was important for Nevaeh because the uncertainty keeps her in a dysregulated state.

Nevaeh's life has been in a state of uncertainty for years and she deserves stability and permanency. Nevaeh should not be made to linger in foster care to see if Michael will maintain sobriety, stay out of jail, and find suitable housing. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). There is no basis on this record to conclude that permanency could be achieved in the foreseeable future if Michael's parental rights remain intact. We therefore

conclude that the juvenile court did not err in finding there is clear and convincing evidence to show Michael was unfit and that terminating his parental rights was in Nevaeh's best interests.

## CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for terminating Michael's parental rights existed under § 43-292(2) and that termination of his parental rights was in Nevaeh's best interests. The juvenile court's order is affirmed.

AFFIRMED.